The jury found for the defendant.

---

## Case No. 13,562.

### In re STUPP.

[11 Blatchf. 124;[1] 18 Int. Rev. Rec. 18.]

Circuit Court, S. D. New York. April 25, 1873.

EXTRADITION—JURISDICTION TO TRY THE CRIME—TREATY WITH PRUSSIA—CRIMES COMMITTED BY PRUSSIAN SUBJECT IN BELGIUM.

1. The extradition convention. of June 16, 1852 (10 Stat. 964), between the United States and Prussia, for "the mutual delivery of criminals, fugitives from justice," in certain cases. provides, that the contracting parties shall. on requisition. deliver up to justice all persons who. being charged with the crimes therein specified, "committed within the jurisdiction of either party. shall seek an asylum, or shall be found, within the territories of the other." S., alleged to be a native of Prussia. and since his birth and still a subject of the king of Prussia, was arrested in the United States. for extradition to Prussia, charged with having committed, at Brussels, in Belgium, "and within the

[1] [Reported by Hon. Samuel Blatchford. District Judge, and here reprinted by permission.]

legal jurisdiction of Prussia," crimes specified in said convention. It was alleged, that, inasmuch as such crimes were, at the time they were committed, punishable by the laws of Belgium, S., being, when they were committed, a subject of Prussia, was, by the laws of Prussia, subject to be punished for said crimes in Prussia; that a prosecution against him therefor had been commenced in Prussia, and a warrant of arrest therefor had been issued against him by the proper judicial tribunal in Prussia having jurisdiction thereof; and that, immediately after committing the crimes, he had fled from the justice of Belgium and Prussia. There was no extradition treaty between the United States and Belgium: Held, that the case was one within the said convention.

2. The provisions for extradition contained in the treaties and conventions for that purpose between the United States and foreign countries, considered, as bearing on the meaning of the word "jurisdiction," used therein.

3. Out of seventeen of those treaties and conventions, which are now in force, all but one provide for the delivery of persons charged with crimes committed within the "jurisdiction" of one party, who shall seek an asylum within the "territories" of the other.

4. Consideration of the treaties between the United States and foreign countries, respecting the jurisdiction of the United States over crimes committed in those foreign countries, and of the laws of the United States passed in pursuance of the provisions of those treaties, and to carry them into effect, and of the practical execution of those laws.

5. Consideration of the laws of the United States respecting the jurisdiction of the United States over crimes not committed within the physical territory of the United States, other than laws passed in pursuance of treaties, as showing an assumption by the United States of jurisdiction over offences committed outside not only of the physical territorial limits of the United States, but outside of the quasi territorial limits of the United States, such as an American vessel on the high seas, and outside of territorial limits granted by treaty.

At law.

Edward Salomon, for the German government.

William F. Kintzing, for prisoner.

BLATCHFORD, District Judge. This case presents a question which, so far as I am aware, has never been adjudicated in the United States, nor in any of the countries with which the United States has treaties containing provisions for the extradition of persons charged with crimes. The language upon which that question arises, is found in numerous treaties between the United States and foreign countries, and in some treaties between Great Britain and other countries in Europe. I have, therefore, bestowed upon the matter a good deal of attention, for the purpose of arriving at a conclusion, not only satisfactory to myself, but one which, in view of the importance of the question, might be supported by reasons which should commend it as a proper decision.

On the 29th of November, 1872, the secretary of state, on the application of the minister plenipotentiary of the German empire, issued his certificate, commonly called a "mandate," which sets forth, that, pursuant to the first article of the convention between the United States and Prussia, and other states of the Germanic confederation, of the 16th of June, 1852, the said minister had made application to the government of the United States for the arrest of Joseph Stupp alias Carl Vogt, charged with the crimes of arson, murder and robbery, and alleged to be a fugitive from the justice of the German empire, and that it appears proper that he should be apprehended, and the case examined in the mode provided by the acts of congress of August 12, 1848 (9 Stat. 302), and June 22, 1860 (12 Stat. 84), and then states, that, to the end that the officers to whom the mandate is directed may cause the necessary proceedings to be had in pursuance of said acts, in order that the evidence of the criminality of the said accused may be heard and considered, and, if deemed sufficient to sustain the charge, that the same may be certified, together with a copy of all the proceedings, to the secretary of state, that a warrant may issue for his surrender, pursuant to said convention, the facts above recited are certified.

This mandate was presented to a duly authorized United States commissioner, and, at the same time, a verified complaint in writing was made by Mr. Johannes Roesing, the consul general of the German empire. This complaint sets forth, that Mr. Roesing is, ex officio, "consul general of each of the states composing the German empire, that the kingdom of Prussia is one of the states composing said empire, and this complainant is, ex officio, the consul general of said kingdom at said city of New York, for the United States of America; that, as this complainant, from official evidence in his possession, and other reliable information received, is informed and believes, one Joseph Stupp alias Carl Vogt, a native of the said kingdom, and since his birth and now a subject of the king of Prussia, did, on or about the first day of October, in the year eighteen hundred and seventy-one, at the city of Brussels, in the kingdom of Belgium, then being a subject of Prussia, as aforesaid, and within the legal jurisdiction of Prussia, feloniously, and with malice aforethought, kill and murder another person, to wit, the Chevalier Dubois de Bianco, and did there and then feloniously, maliciously, and wilfully set on fire and burn the house of another person, to wit, the dwelling-house of said, the Chevalier Dubois de Bianco, then occupied by him, the said Chevalier Dubois de Bianco, and did then and there further feloniously and forcibly take from the person of another, to wit, from the person of said Chevalier Dubois de Bianco, by violence, money and personal property of large value, to wit, of the value of six hundred thousand francs, equal to about one hundred and twenty thousand dollars, of the coin of the United States. And the complainant further shows, that he is familiar with the laws of Prussia, and that, by said laws, it is expressly provided, that a Prussian subject, who, in a for-

eign country, has committed a crime of the nature above charged against said Joseph Stupp alias Carl Vogt, and which is punishable by the laws of the place where it was committed, may be prosecuted and punished in Prussia for such crime. And this complainant further says, on information and belief, that the said crimes of murder, arson and robbery, above charged against said Joseph Stupp alias Carl Vogt, are and were, at the time of their commitment, punishable by the laws of the kingdom of Belgium, where they were committed, and that said Joseph Stupp alias Carl Vogt then was, and now is, by the laws of Prussia, subject to prosecution and punishment for said crimes in Prussia, he being, at the time of their commitment, a Prussian subject, as aforesaid. And this complainant further says, on information and belief, the same being founded upon official communications received from the proper officers of the kingdom of Prussia, that a prosecution has actually been commenced at Cologne, in the kingdom of Prussia, against said Joseph Stupp alias Carl Vogt, and a warrant of arrest has been issued by the proper judicial tribunal having jurisdiction thereof, in order that he might be apprehended and tried, and, if found guilty, might be punished for the said crimes of murder, arson, and robbery, above stated, and with which he is charged in said proceedings. This complainant, therefore, on his oath, complains and charges, that the said Joseph Stupp alias Carl Vogt did, on or about the first day of October, 1871, commit the crimes of murder, arson, and robbery, within the jurisdiction of Prussia. And this complainant further shows, on information and belief, that, immediately after the commission of said crimes, said Joseph Stupp alias Carl Vogt fled from the justice of Belgium and Prussia, and now is, and may be found, within the United States of America; that efforts have been made by the government of Belgium to obtain the surrender and extradition of said Joseph Stupp alias Carl Vogt, in order that he might be tried for said crimes in Belgium; but that said efforts have failed, and his surrender to Belgium by the government of the United States has not been effected, because no treaty for the surrender of criminals exists between the United States and Belgium. And this complainant further shows, that, upon the application of the government of Prussia, the executive department of the government of the United States has issued its mandate, which is herewith presented, for the arrest and examination of said Joseph Stupp alias Carl Vogt, charged with the crimes aforesaid, with the view to his extradition and surrender under the treaty between the United States and Prussia, of June 16th, 1852. This complainant, therefore, prays, that a warrant may issue for the apprehension of the said Joseph Stupp alias Carl Vogt, charged as aforesaid, that he may be brought before a proper judge or commissioner of the United States, to the end that the evidence of his criminality may be heard and considered, and if, on such hearing, the evidence be deemed sufficient to sustain said charge, under the provisions of said treaty, the same may be certified to the secretary of state of the United States, that a warrant may issue for the surrender of said fugitive, under the provisions of said treaty, and that such other or further steps may be taken, or proceedings had, as may be in accordance with law and justice, and the provisions of said treaty."

This complaint was sworn to on the 7th of December, 1872. Upon it a warrant was issued by the commissioner, on the 9th of December, 1872, reciting the contents of the complaint, and the issuing of the mandate, and directing the marshal of this district to apprehend the prisoner and bring him before the commissioner who issued the warrant, to the end that the evidence of his criminality might be heard and considered. He was arrested and brought before the commissioner on the 10th of April, 1873, and the proceedings were adjourned until the 12th, the prisoner being, in the meantime, committed to the custody of the marshal. On the 12th the proceedings were again adjourned to the 15th, and on the 15th they were again adjourned to the 22d.

On the 15th of April, a petition was presented, on behalf of the prisoner, to me, as sitting in the circuit court for this district, setting forth that the prisoner was restrained of his liberty by the marshal, in pursuance of said warrant, and that the warrant was issued upon the said complaint, and reciting the contents of the complaint, and then averring that the prisoner is not a subject of the king of Prussia, and is not guilty of the charge, and that, admitting the truth of all the allegations against him, he is not amenable to the laws of the kingdom of Prussia, and that the crime which is alleged to have been committed was not committed within the jurisdiction of the kingdom of Prussia, but was committed in Belgium, and that, under the extradition treaty between the United States and Prussia, no crimes are included except those occurring within the territorial limits of the respective governments, and that neither within the spirit nor the letter of the treaty can either government make any demand upon the other for the surrender of an alleged criminal who has committed any crime or offence in a foreign country. The petition prays for a writ of habeas corpus, directed to the marshal, to produce the body of the prisoner, and for a writ of certiorari, directed to the commissioner, to certify the proceedings.

This petition was sworn to on the 14th of April. On the 15th of April, both of the writs were granted. They were made returnable before this court, on the 16th. On that day returns were made to both of them, and the body of the prisoner was produced. The return to the writ of habeas corpus sets

forth the warrant and the commitments endorsed thereon, as the cause of the detention of the prisoner, and the return to the certiorari sets forth all the proceedings that have taken place before the commissioner.

The sole question involved is, as to whether this is a case falling within the treaty between the United States and Prussia. It becomes necessary, therefore, to look at the terms of the treaty. The treaty was concluded on the 16th of June, 1852 (10 Stat. 964), and is a special extradition convention between the United States and Prussia, and other states of the Germanic confederation, for "the mutual delivery of criminals, fugitives from justice, in certain cases." The preamble of the treaty sets forth, that "whereas, it is found expedient, for the better administration of justice, and the prevention of crime within the territories and jurisdiction of the parties respectively, that persons committing certain heinous crimes, being fugitives from justice, should, under certain circumstances, be reciprocally delivered up, and also to enumerate such crimes explicitly, and, whereas, the laws and constitution of Prussia, and of the other German states, parties to this convention, forbid them to surrender their own citizens to a foreign jurisdiction, the government of the United States, with a view of making the convention strictly reciprocal, shall be held equally free from any obligation to surrender citizens of the United States." That is all that is important in the preamble. The first article of the convention proceeds to say, "that the United States and Prussia, and the other states of the Germanic confederation included in, or which may hereafter accede to, this convention, shall, upon mutual requisitions by them, or their ministers, officers, or authorities, respectively made, deliver up to justice all persons who, being charged with the crime of murder, * * * or arson, or robbery, * * * committed within the jurisdiction of either party, shall seek an asylum, or shall be found, within the territories of the other." Then follows, in the same article, the usual provision which is found in all of our extradition treaties, "that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed." The third article is as follows: "None of the contracting parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention." The fourth article is in these words: "Whenever any person, accused of any of the crimes enumerated in this convention, shall have committed a new crime in the territories of the state where he has sought an asylum, or shall be found, such person shall not be delivered under the stipulations of this convention, until he shall have been tried, and shall have

received the punishment due to such new crime, or shall have been acquitted thereof." These are all the provisions of the convention which seem to have any bearing on the question under discussion. This convention was proclaimed by the president on the 1st of June, 1853. Under a provision inserted in it, for the accession of other states of the Germanic confederation, it has been acceded to by the Free Hanseatic City of Bremen, and the governments of Mecklenburg-Strelitz, Wurtemberg, Mecklenburg-Schwerin, Oldenburg, and Schaumburg-Lippe.

The question involved in this case turns upon the meaning of the language of the first article of the treaty, that the contracting parties agree to mutually "deliver up to justice all persons who, being charged with," certain crimes "committed within the jurisdiction of either party, shall seek an asylum, or shall be found, within the territories of the other," as that language shall be interpreted, in view of the entire language of the treaty, including the provisions of the third and fourth articles, and the language of the preamble, that the convention is entered into "for the better administration of justice, and the prevention of crime within the territories and jurisdiction of the parties respectively," and in order "that persons committing certain heinous crimes, being fugitives from justice," shall, under certain circumstances, be reciprocally delivered up.

For the purpose of arriving at a satisfactory conclusion, it will be useful to consider three classes of subjects, developed in treaties and laws of the United States, as throwing light on the intention of the United States, as one of the contracting parties, in the language used in the convention in question. The first subject is—prior and subsequent extradition treaties made by the United States, containing similar language. The second subject is—prior and subsequent treaties between the United States and foreign countries, respecting the jurisdiction of the United States over crimes committed in those foreign countries, and, also laws of the United States passed in pursuance of such treaties, and to carry them into effect. The third subject is—prior and subsequent laws of the United States respecting the jurisdiction of the United States over crimes not committed within the physical territory of the United States, other than laws passed in pursuance of the treaties last referred to.

The first treaty, providing for extradition, which the United States ever made, and the only one which it made for a long period, was the treaty with Great Britain, of the 19th of November, 1794 (8 Stat. 129), which was a general treaty, covering a large number of subjects, the 27th article of it containing the provision for extradition. That provision was in force for the period of twelve years only, when it expired by its own limitation. From that time down to the year 1842, a period of thirty-six years, this coun-

try had no extradition treaty with any foreign nation. The 27th article of such treaty with Great Britain, of 1794, was a very brief provision, to this effect, that the parties agreed that they, "on mutual requisitions, by them respectively, or by their respective ministers or officers authorized to make the same, will deliver up to justice all persons who, being charged with murder or forgery, committed within the jurisdiction of either, shall seek an asylum within any of the countries of the other." Thus, very much the same language was used in this first treaty with Great Britain, that is used in the later treaty with Prussia.

The next treaty on the subject was the treaty with Great Britain, generally known as the "Ashburton Treaty," of the 9th of August, 1842 (8 Stat. 576). That treaty is a general treaty, the 10th article of which contains a provision for extradition. The language is substantially the same as in the treaty of 1794. It provides that the parties shall "deliver up to justice all persons who, being charged with" murder and other offences specified, "committed within the jurisdiction of either, shall seek an asylum, or shall be found, within the territories of the other." The change from the treaty of 1794 consists in the addition of the words, "or shall be found." The treaty of 1794 says, "shall seek an asylum within any of the countries of the other." The treaty of 1842 says, "shall seek an asylum, or shall be found, within the territories of the other."

The next treaty on the subject of extradition was the first special convention the United States ever made with any country for the delivery of criminals. It was made with France, on the 9th of November, 1843 (8 Stat. 580). That special convention adopted a form of expression, both in the preamble and in the article for extradition, which has been followed as a model, substantially, in all the special conventions which have been since entered into by the United States with foreign countries, for extradition, all of which contain preambles in substantially the same language as the one with Prussia, now under consideration. This convention with France, of 1843, which is the one still in force between the United States and France, says, in its preamble, that the parties have "judged it expedient, with a view to the better administration of justice, and to the prevention of crime, in their respective territories and jurisdictions, that persons charged with the crimes hereinafter enumerated, and being fugitives from justice, should, under certain circumstances, be reciprocally delivered up." The first article provides, that the "contracting parties shall, on requisitions made in their names, through the medium of their respective diplomatic agents, deliver up to justice persons who, being accused of the crimes enumerated in the next following article, committed within the jurisdiction of the requiring party, shall seek an asylum, or shall be found, within the territories of the other." That language of the first article is substantially con-

tained in all the special extradition conventions, and in all the other treaties in which there have been provisions for extradition, which have since been made.

The next treaty is the one with the Hawaiian Islands, of the 20th of December, 1849, which is a general treaty (9 Stat. 981), the 14th article of which contains a provision for surrender by the parties, of "all persons who, being charged with" certain specified crimes, "committed within the jurisdiction of either, shall be found within the territories of the other."

Next in order of time comes the convention with Prussia, already referred to.

The next treaty after that was a special extradition convention with Bavaria, made on the 12th of September, 1853 (10 Stat. 1022). It is peculiar in its language. Like all the other special extradition conventions, it contains a preamble, but that preamble differs from those to which I have already referred, in stating, that the parties, "actuated by an equal desire to further the administration of justice, and to prevent the commission of crimes in their respective countries, taking into consideration that the increased means of communication between Europe and America facilitate the escape of offenders, and that, consequently, provision ought to be made in order that the ends of justice shall not be defeated, have determined to conclude an arrangement destined to regulate the course to be observed in all cases, with reference to the extradition of such individuals as, having committed any of the offences hereafter enumerated, in one country, shall have taken refuge within the territories of the other." In the first article, it is agreed, that the parties shall "deliver up to justice all persons who, being charged with" certain specified crimes, "committed within the jurisdiction of either party, shall seek an asylum, or shall be found, within the territories of the other." Thus, the words, "committed within the jurisdiction of either party," are introduced in the first article, while, in the preamble, it is said, that the extradition is to be of "such individuals as, having committed" certain offences "in one country, shall have taken refuge within the territories of the other." This convention, it may be remarked, contains, in its third article, the provision in regard to not delivering up citizens or subjects, and, also, in its fourth article, the provision in regard to new crimes committed in the territories of the country where the party is found.

Two years after this special convention with Bavaria, a special convention was made with Hanover, January 18, 1855 (10 Stat. 1138), which is identical in language with the convention with Bavaria. No others have ever been made on that model.

The next one in order is a treaty with the Swiss confederation, a general treaty (11 Stat. 593), in which, in the 13th article, there is a provision for extradition. That treaty was made on the 25th of November, 1850, and proclaimed on the 9th of November, 1855. It has no preamble. It contains a provision for the

extradition of "persons who, being charged with the crimes enumerated in the following article, committed within the jurisdiction of the requiring party, shall seek asylum, or shall be found, within the territories of the other."

The next in order is a treaty with the two Sicilies, of the 1st of October, 1855 (11 Stat. 651), a general treaty, the 21st article of which, in its provision for extradition, is peculiar in its language, in providing, "that every person who, being charged with, or condemned for, any of the crimes enumerated in the following article, committed within the states of one of the high contracting parties, shall seek asylum in the states, or on board the vessels of war, of the other party, shall be arrested and consigned to justice, on demand made, through the proper diplomatic channel, by the government within whose territory the offence shall have been committed." This treaty is no longer in force, because the kingdom of the two Sicilies has been incorporated into the kingdom of Italy, and there is a very recent extradition treaty between the United States and Italy, which supersedes the Sicilian treaty.

The next in order is a special extradition convention with Austria, made on the 3d of July, 1856 (11 Stat. 691). It is the same, in language, as the convention with Prussia, now under consideration.

The next is a special extradition convention with Baden, made January 30, 1857 (11 Stat. 713). That, also, is just like the one with Prussia.

The next is a special extradition convention with Sweden and Norway, of the 21st of March, 1860 (12 Stat. 1125). That, also, is like the one with Prussia, in the particulars under consideration.

The next is a general treaty with Venezuela, of the 27th of August, 1860 (12 Stat. 1159), the 27th article of which contains provisions for delivery, similar in terms to those contained in the convention with France, before mentioned.

The next is a special extradition treaty with Mexico, of the 11th of December, 1861 (12 Stat. 1199). It is like the special convention with France, in its language, in the particulars already referred to, and not different, in substance, from the one with Prussia.

The next is a general treaty with Hayti, of November 3, 1864 (13 Stat. 727), in which the terms of the extradition provision (article 38) are the same as in the treaty with the Swiss Confederation.

The next is the treaty with the Dominican Republic, of February 8, 1867 (15 Stat. 488), the 27th article of which provides for extradition, in the same terms as the provision in the treaty with the Swiss Confederation.

The next is the special extradition convention with Italy, of March 23, 1868 (15 Stat. 629). It is substantially like the one with Prussia, in the particulars referred to, except that there is no provision in it for the non-delivery of subjects or citizens.

The next, and the last, is the special extradition convention with Nicaragua, of June 25, 1870 (17 Stat. 815), which is just like the one with Italy, in the particulars mentioned.

The summary of all these treaties, of which there are seventeen, exclusive of the treaty of 1794, with Great Britain, is, that in eight of them, which are special extradition conventions, (that is, those with France, Prussia, Austria, Baden, Sweden and Norway, Mexico, Italy, and Nicaragua,) there is a recital, in the preamble, that the object of the treaty is "the prevention of crime within the territories and jurisdiction of the parties respectively," by the delivery up of "persons who are fugitives from justice." It further appears, that, in fourteen treaties or conventions, (of which eight are these special extradition conventions,) the provisions as to delivery are for the delivery of persons charged with crimes committed within the "jurisdiction" of one of the parties, who shall seek an asylum, or shall be found, within the territories of the other. This provision is found in fourteen subsisting treaties of the United States, namely, those with Great Britain, France, the Hawaian Islands, Prussia, the Swiss Confederation, Austria, Baden, Sweden and Norway, Venezuela, Mexico, Hayti, the Dominican Republic, Italy, and Nicaragua, six of them being general treaties, with no previous recital in a preamble. Then there are the special cases to which I have alluded —the conventions with Bavaria and Hanover, which, in their preambles, speak about preventing the commission of crimes "in their respective countries," and about offences committed "in one country," and then provide for the delivery of persons charged with crimes committed "within the jurisdiction of either party," who "shall seek an asylum, or shall be found, within the territories of the other." Then there is the treaty with the two Sicilies, which contains the peculiar language which I have recited. It thus results, that, out of eighteen treaties, (or seventeen, excluding the one with Great Britain, of 1794,) all but one provide for the delivery of persons charged with crimes committed within the "jurisdiction" of one party, who shall seek an asylum within the territories of the other.

The second subject to which I referred was —prior and subsequent treaties between the United States and foreign countries, respecting the jurisdiction of the United States over crimes committed in those foreign countries, supplemented by laws of the United States passed in pursuance of the provisions of those treaties, and to carry them into effect. As I remarked before, the first special convention made between the United States and any country, for extradition, was that with France, made on the 9th of November, 1843, and contains the declaration, that it is made for the purpose of reaching persons committing crimes within the territories and jurisdiction of the one party, who shall become fugitives from justice, and shall seek an asylum, or be found, within the territories

of the other party. The second special convention was that between the United States and Prussia, of the 16th of June, 1852. It becomes important, therefore, to see whether there was anything at those dates, 1843 and 1852, in the treaties and legislation of the United States, which can throw light upon the meaning of the United States, in using the language it did in its treaties with France and Prussia, and in the subsequent treaties which have followed the language of those treaties.

On the 7th of May, 1830, the United States made a treaty with the Ottoman Porte, commonly called Turkey (8 Stat. 409), which contains a provision, in the fourth article, that citizens of the United States committing an offence in Turkey "shall not be arrested and put in prison by the local authorities, but shall be tried by their minister or consul, and punished according to their offence, following, in this respect, the usage observed towards other Franks." No law of the United States was passed to carry that provision into practical effect until the year 1848. Meantime, before the extradition convention with Prussia was made, and on the 3d of July, 1844, a treaty was made between the United States and China (8 Stat. 596), the 21st article of which provides, that "citizens of the United States, who may commit any crime in China, shall be subject to be tried and punished only by the consul, or other public functionary, of the United States, thereto authorized, according to the laws of the United States." In view of those two treaties, one made in 1830, and the other in 1844, the congress of the United States, on the 11th of August, 1848, passed an act (9 Stat. 276) entitled, "An act to carry into effect certain provisions in the treaties between the United States and China, and the Ottoman Porte, giving certain powers to ministers and consuls of the United States, in those countries." That act was passed four years before this treaty was made with Prussia, and it gives to the commissioner and the consuls of the United States, (the chief functionary of the United States in China at that time being called a commissioner and not a minister,) appointed to reside in China, power to try, in the manner provided in the act, all citizens of the United States charged with offences against law, that is, against the law of China, committed in the dominions of China. The 2d section of that act provides, "that, in regard to crimes and misdemeanors, the said public functionaries are hereby fully empowered to arraign and try, in the manner herein provided, all citizens of the United States charged with offences against law, which shall be committed in the dominions of China, including Macao, and, upon conviction, to sentence such offenders in the manner herein authorized; and said functionaries and each of them are hereby authorized to issue such processes as are suitable and necessary to carry this authority into execution." The act also extends the laws of the United States, so far as is necessary to execute the treaty, over all citizens of the United States in China, so far as such laws are suitable to carry the treaty into effect. It also authorizes the consuls of the United States in China to arrest any citizen of the United States charged with committing in China an offence against law, and to try him, and, on conviction, to punish him by fine or imprisonment; and, in cases of murder, and insurrection or rebellion against the Chinese government, with intent to subvert the same, to punish the offence with death, by executing the convict, if the commissioner shall issue a warrant for the purpose. The act also gives the same powers to the minister resident and consul of the United States in Turkey, in reference to crimes committed by citizens of the United States in Turkey, under the treaty of May 7th, 1830. It is to be noted, that this act was passed on the day before the act of the 12th of August, 1848, was passed (9 Stat. 302), which is one of the acts under which the proceedings in the present extradition case are taking place. This act of August 12th, 1848, prescribes the course of procedure in the United States under extradition treaties, and provides for the issuing of a warrant and the holding of an examination, with a view to extradition, where complaint is made, charging "any person found within the limits of any state, district or territory, with having committed, within the jurisdiction of any such foreign government, any of the crimes enumerated or provided for by any such treaty or convention." These treaties and the act to carry them into effect were in force when the convention with Prussia was made, in 1852.

A treaty was also made between the United States and Borneo, on the 23d of June, 1850, but not proclaimed until the 12th of July, 1854 (10 Stat. 910), the 9th article of which provides, that, "in all cases where a citizen of the United States shall be accused of any crime committed in any part" of the dominions of the sultan of Borneo, "the person so accused shall be exclusively tried and adjudged by the American consul, or other officer duly appointed for that purpose." It does not appear that any law of the United States has been passed to carry this provision into effect.

Then, a treaty was made with Siam, on the 29th of May, 1856 (11 Stat. 684), the 2d article of which provides, that "criminal offences will be punished, in the case of American offenders, by the consul, according to American laws."

Then came a treaty with Japan, of June 17, 1857, (11 Stat. 723), the 4th article of which provides, that "Americans committing offences in Japan shall be tried by the American consul-general or consul, and shall be punished according to American laws."

On the 29th of July, 1858, another treaty was made with Japan (12 Stat. 1056), the

6th article of which provides, that "Americans committing offences against Japanese shall be tried in American consular courts, and, when guilty, shall be punished according to American laws."

These treaties with Japan and Siam, of 1856, 1857 and 1858, made necessary a further act of congress, and an act was passed, on the 22d of June, 1860 (12 Stat. 72), covering the provisions of the treaties with China, Japan, Siam, and Turkey, in reference to criminal offences, and superseding the act of August 11th, 1848. This act of the 22d of June, 1860, contains substantially the same provisions which were embraced in the act of August 11th, 1848, applied to offences committed by citizens of the United States in China, Japan, Siam and Turkey, and providing for the jurisdiction of such offences by the ministers and consuls of the United States in those countries. This act has been put into practical execution. It appears, by the diplomatic correspondence of the United States, that one David Williams was tried and convicted in the consular court at Shanghai, for piracy and murder, in robbing and killing three Chinese. The United States minister to China, on the 23d of November, 1863, issued a warrant for his execution. On the 1st of March, 1864, a few hours before the time fixed for his execution, he committed suicide. One James White was tried and convicted in the consular court at Shanghai, on the 23d of November, 1863, of the murder of Samuel Webster. A warrant was issued for his execution, but he broke jail and escaped, owing to the insufficient means provided for taking care of prisoners. A third, and more remarkable, case was that of John D. Buckley, who, on the 22d of May, 1863, murdered, at Shanghai, John McKennon, a citizen of the United States, and the master of an American merchant ship. After the offence was committed, Buckley, under another name, took passage, at Shanghai, for Havre, in France, on board of a French vessel. The vessel stopped at Nagasaki, in Japan. The American consul at Nagasaki applied to the French consul there, for permission to arrest Buckley. The French consul arrested Buckley and put him in the French prison, at Nagasaki, and the vessel went to France without him. The French consul laid the case before the French minister in Japan. He declined to surrender Buckley to the American minister in Japan, on the ground, that, under the extradition treaty between the United States and France, the surrender of the fugitive must be made by the French government at home, on the demand of the American government; but he offered to send Buckley to France, to await a demand there. The American minister in Japan then arranged to arrest Buckley when he should be discharged from the French custody in Nagasaki, and to send him to Shanghai, to be delivered to the American consul there, and the captain of a British government steamer agreed to take Buckley to Shanghai under guard, when he should be arrested. This was early in January, 1864. Shortly afterwards, Buckley surrendered himself to the American consul at Nagasaki, and was sent to Shanghai in such British government steamer. He was tried at Shanghai for the murder, on the 1st of February, 1864, before the American consul general, and four associates, and was convicted and sentenced to be hung. The United States minister in China, on the 11th of March, 1864, issued a warrant for his execution, and he was hung at Shanghai, on the 1st of April, 1864. The proceedings in Buckley's case were approved by the president. Dip. Cor. 1864, pt. 3, pp. 392–419, 440, 474, 478, 479.

On the 14th of February, 1867, a treaty was made between the United States and Madagascar, (15 Stat. 492), the 5th article of which provides, that citizens of the United States shall, as to criminal offences committed, by them in Madagascar, be under the exclusive criminal jurisdiction of their own consul only, duly invested with the necessary powers. By the act of July 1, 1870 (16 Stat. 183), the Act of July 22, 1860, before mentioned, is, so far as it is in conformity with the stipulations of the said treaty with Madagascar, extended to that country, and to any country of like character, with which the United States may thereafter enter into treaty relations.

Such are the law and the facts in regard to these treaty provisions, the acts of congress thereon, and the practical execution of them, in respect to the jurisdiction specially conferred, by treaty, upon officers of the United States, in regard to crimes committed by citizens of the United States, wholly out of the physical territory of the United States, and not on board of vessels of the United States.

The third subject to which I referred was —prior and subsequent laws of the United States respecting the jurisdiction of the United States over crimes not committed within the physical territory of the United States, other than laws passed in pursuance of treaties, as showing an assumption by the United States of jurisdiction over offences committed outside, not only of the physical territorial limits of the United States, but outside of the quasi territorial limits of the United States, and outside of territorial limits granted by treaty.

We are entirely familiar with the jurisdiction exercised over offences committed on vessels, a vessel being regarded as a part of the country whose flag she bears. There are many acts of the kind passed by the congress of the United States. One is the act of April 30, 1790 (1 Stat. 113), the 8th section of which provides: "That, if any person or persons shall commit upon the high seas, or in any river, haven, basin, or bay, out of the jurisdiction of any particular state,

murder or robbery or any other offence, which, if committed within the body of a county, would, by the laws of the United States, be punishable with death, * * * every such offender shall be deemed, taken, and adjudged to be a pirate and felon, and, being convicted, shall suffer death; and the trial of crimes committed on the high seas, or in any place out of the jurisdiction of any particular state, shall be in the district where the offender is apprehended, or into which he may first be brought."

But, the United States has gone further. There is a statute passed on the 18th of August, 1856 (11 Stat. 61), the 24th section of which provides, that a person who takes a false oath before a secretary of legation or consular officer of the United States in a foreign country, shall be deemed guilty of perjury, and "may be charged, proceeded against, tried, convicted, and dealt with, in any district of the United States, in the same manner, in all respects, as if such offence had been committed in the United States." This language plainly recognizes it to be the fact, that, under such circumstances, the offence is not committed in the United States. The jurisdiction in such case, therefore, is not assumed upon the theory that the offence is committed within the territory of the United States, or within the quasi territory of the United States, or within territory as to which jurisdiction is conferred by a treaty between the United States and a foreign power, and the act is not confined to an offence committed by a citizen of the United States. The jurisdiction is entirely outside of any such support.

So, in the Act of June 22, 1860, before referred to, it is provided, by the 30th section (12 Stat. 78), that the consuls and commercial agents of the United States, at islands, or in countries, not inhabited by any civilized people, or recognized by any treaty with the United States, shall have authority to try offences and misdemeanors committed by citizens of the United States, and punish them by fine or imprisonment. This provision does not rest on any theory of territory, or quasi territory, or on any jurisdiction conferred by treaty. It apparently rests on the same principle on which the statute of Prussia, referred to in the present case, is founded—the right of a state to punish its own citizens, in respect of crimes committed by them abroad, even in places where it has no physical territorial jurisdiction, no quasi territorial jurisdiction, and no treaty jurisdiction. There may be other acts of congress bearing on the subject, but those cited are sufficient to illustrate the principle on which the claim for extradition in the present case is rested.

The statute of Prussia provides, that there may be prosecuted and punished according to the criminal law of Prussia, a Prussian who, in a foreign country, has committed an act which, according to the laws of Prussia,

is to be considered a crime or misdemeanor and which is punishable by the laws of the place where it has been committed, with the restriction, that there shall be no prosecution if the court of the foreign country has adjudicated on the act, and an acquittal or punishment has taken place; or if, according to the laws of the foreign country, the time limited for prosecution or punishment has expired, or the punishment has been remitted; or if, according to the laws of the foreign country a request of the injured person is required, and such request has not been made.

The acts of the congress of the United States recognize, therefore, the principle of punishing, by the laws of the United States, offences committed by citizens of the United States outside of the physical territory of the United States, and outside of a vessel bearing the flag of the United States, and outside of any place which can be called the quasi territory of the United States, by virtue of a treaty It follows, that the United States recognizes and did recognize, when this convention with Prussia was made, a jurisdiction to try offences, at least when committed by citizens of the United States, which extends to offences committed outside of the physical territory of the United States. Hence, there was and is a subject-matter, recognized by the United States, for the operation of a distinction between the word "jurisdiction" and the word "territories," when those two words are used in treaties, in juxtaposition, and yet in contrast.

In this connection, it is not inapt to remark that the language used in this treaty with Prussia, and in the other treaties between the United States and foreign countries, is also found in various treaties between European countries, in regard to extradition. In the extradition treaty between Great Britain and France, of February 13th, 1843, the preamble states, that the parties "have judged it expedient, with a view to the better administration of justice, and to the prevention of crime within their respective territories and jurisdictions, that persons charged with the crimes hereinafter enumerated, and being fugitives from justice, shall, under certain circumstances, be reciprocally delivered up." The treaty then provides, that the parties shall "deliver up to justice persons who, being accused of" the crimes specified, "committed within the jurisdiction of the requiring party, shall seek an asylum, or shall be found, within the territories of the other." The treaty of May 28th, 1852, between Great Britain and France, provides, that they shall "deliver up to each other, reciprocally, any persons, except native subjects or citizens of the party upon whom the requisition may be made, who, being convicted or accused of any of the crimes hereinafter specified, committed within the jurisdiction of the requiring party, shall be found within the territories of the other

party." In the treaty between Great Britain and Denmark, of April 15th, 1862, the preamble says, "with a view to the better administration of justice, and to the prevention of crime within their respective territories and jurisdictions," and the provision is for the delivery up to justice of persons who, being accused or convicted of certain crimes "committed within the jurisdiction of the requiring party, shall be found within the territories of the other." So, too, in the treaty between Great Britain and Prussia, of March 5. 1864, the same language is found as that just cited from the treaty between Great Britain and Denmark.

The question, then, arises, whether there is anything in the language of this treaty with Prussia, and of other treaties containing like language, or in the rules of interpretation laid down in any decisions which have been cited on the subject, to restrict the operation of the distinction to which I have referred, between the word "jurisdiction" and the word "territories," and to prevent the giving to the word "jurisdiction" an enlarged meaning, equivalent to the words, "authority, cognizance, or power of the courts." Prussia gives such construction to the word "jurisdiction," as used in the treaty with her, by the very fact, that, having established by law the jurisdiction referred to, she demands the extradition of this prisoner. There certainly is nothing in the language of the treaty that requires any such restriction, because, in the first article of the treaty, where the agreement for delivery is found, the language is, specifically, that those persons shall be delivered up, who have committed the designated crimes within the "jurisdiction" of the requiring party, and shall be found within the "territories" of the other party. If it had been intended to limit the extradition to cases of crimes committed within the "territories" of the requiring party, it would have been easy to say so, as in the treaty with the Two Sicilies, where the designation is, crimes "committed within the states of one of the high contracting parties." But, there being a subject-matter for the operation of a meaning to the word "jurisdiction," beyond the meaning of the word "territory," we find that the preamble to the treaty uses the words "territories and jurisdiction," stating the object of the treaty to be "the prevention of crime within the territories and jurisdiction of the parties respectively." It cannot be predicated of this language, that the word "territories" and the word "jurisdiction" are used as synonymous words. It is a reasonable construction, that the word "jurisdiction" is ampler in its scope than the word "territories," and that the two words, used in juxtaposition in both the preamble and the first article, are used in contrast and in different senses

The principle of enlarged jurisdiction, to which I have referred, is recognized by judicial authority. In Holmes v. Jennison, 14 Pet. [39 U. S.] 540, 568, 569, Chief Justice Taney says, that the states of the Union "may, if they think proper, in order to deter offenders from other countries from coming among them, make crimes committed elsewhere punishable in their courts, if the guilty party shall be found within their jurisdiction" In Re Tivnan, 5 Best & S. 645, 679, Chief Justice Cockburn says: "An offence may be cognizable, triable and justiciable in two places, e. g., a murder by a British subject in a foreign country. A British subject who commits a murder in the United States of America may be tried and punished here by our municipal law, which is made to extend to its citizens in every part of the world."

Some authorities were cited on the hearing, as having a bearing on the question involved, and as tending to a contrary conclusion from that which seems to me the proper and necessary one in this case. The first one is the opinion of Attorney-General Charles Lee, in 1798 (1 Op. Attys. Gen. 83), on a question arising under the extradition provision in the treaty with Great Britain of 1794. That treaty used the language, before cited, that persons shall be delivered up to justice, who, being charged with crimes "committed within the jurisdiction" of either party, shall "seek an asylum within any of the countries of the other." In his opinion, the attorney-general suggests, that that language means, that the crime must be committed within the territorial jurisdiction of the one nation, and that the person charged with the crime must seek refuge in the territorial jurisdiction of the other nation. On looking into the opinion, it appears, that the demand was made for persons charged with "murder or piracy." The attorney-general states, that it did not appear whether the offence was committed within the jurisdiction of England or any of the British dominions, or on the high seas. He says, that the criminal tribunals in the United States are fully competent to try and punish persons who commit murder on the high seas, or piracy; and he refers to the statutes of the United States on that subject. In that case, one of the offenders was a citizen of the United States, and all of them were in the custody of its officers of justice; and the attorney-general says, that, as the offenders are triable in the courts of the United States, and are in the custody of its laws for trial, he deems it "more becoming the justice, honor, and dignity of the United States, that the trial should be in our courts." It is very clear, that the prisoner in the present case cannot be tried in the United States, for the crimes with which he is charged.

The next case cited is the opinion of Attorney-General Cushing (8 Op. Attys. Gen. 215), which relates to the case of a person whose extradition was asked for by the French minister. He was charged as an accomplice in

a robbery. The papers did not state where the crime was committed, and the attorney-general remarks, that the papers did not allege that the crime was committed in France, and that it ought to appear that the acts of complicity were committed by the party while actually in France. The point raised in the present case was not involved in that case. As it was subsequently made to appear that the offence had been committed in France, and as the person was thereupon surrendered (8 Op. Attys. Gen. 306), the case has no bearing upon the present question.

The most important case cited is the case of the pirates of the American schooner Joseph E. Gerity, decided, on habeas corpus, by the court of queen's bench, in England, in 1864. In re Tivnan, 5 Best & S. 645. That was a case where a demand was made by the government of the United States, for the extradition of the prisoners, as being "charged with piracy on the high seas, within the jurisdiction of the United States." The British government issued a mandate for their arrest. They were arrested and brought before a magistrate, and evidence was taken as to the charge. After that, a writ of habeas corpus was issued, and the prisoners were brought before the court of queen's bench. It was contended, for them, that the case was not within the treaty of August 9th, 1842, between Great Britain and the United States. That treaty provides, that the parties shall, on mutual requisitions, deliver up to justice all persons who, being charged with the crime of "piracy," or other specified crimes, "committed within the jurisdiction of either" of the parties, shall seek an asylum, or be found, within the territories of the other. It was claimed, by the United States, in that case, that the crime was committed within the jurisdiction of the United States. It was committed on the high seas, on board of an American vessel, which had sailed from Matamoras for New York, by persons who sailed on board of the vessel as passengers. The case was argued before four judges of the court, on the construction of the treaty, and the prisoners were discharged by the concurring judgment of three of the four judges, Judges Crompton, Blackburn and Shee being in favor of the discharge, on the ground that the case was not within the treaty, and Chief Justice Cockburn dissenting. It is apparent, from an examination of the remarks of the three judges who concurred in discharging the prisoners, that the case is not one in point on the present question, and that the prisoners were discharged on the ground that the crimes with which they were charged were, in fact, within the jurisdiction of Great Britain as well as of the United States, and that the word "jurisdiction," in the treaty, meant the exclusive jurisdiction of one party as against the other party, and did not mean a jurisdiction which was shared by both of the parties. That is the ground on which the men were dischar-

ged. Mr. Justice Crompton says, in his judgment, speaking of the language of the statute of Great Britain on the subject (6 & 7 Vict. c. 76), which is the language of the treaty: "Looking at the preamble, which, at all events, can be used as a key to the statute, we find these words in it, 'persons who, being charged with the crime of murder, &c., or piracy, &c., committed within the jurisdiction of either of the high contracting parties.' This looks as if persons within the jurisdiction of one of the parties, and not of the other, were intended, 'should seek an asylum or should be found, within the territories of the other.'" "'Asylum,' means a place where the matter may not be tried. The statute then provides for the delivery up to justice of any person charged with the crime of murder, &c., or with the crime of piracy, &c., committed within the jurisdiction of the United States of America, who shall be found within the territories of her majesty. 'Committed within the jurisdiction of the United States of America,' I own, appears to me to mean, within the peculiar jurisdiction of the United States, and would not be properly used, if the common jurisdiction of every maritime nation in the world were meant." He then says, that the case before them is a case of piracy by the law of nations. He adds: "Is this a piracy within the words of the statute? It is to be within the jurisdiction of the United States; but does that mean within the jurisdiction which the whole world shares with them?" He then goes on to make an observation which clearly shows that he did not intend to lay down any principle which would cover a case like the present one. He says: "It must mean, where they have a peculiar jurisdiction; although, whether that would apply to all cases where we have jurisdiction in foreign countries, we need not determine. * * * It is very difficult to my mind to suppose that two of the great maritime nations of the world meant to give up their power of trying pirates wherever caught. * * * These persons are not pirates of one nation or another, but pirates against every nation." The remarks of Mr. Justice Blackburn show that he took the same view of the case, and was in favor of the discharge of the prisoners on the same ground. He says, that, looking at the words alone, "committed within the jurisdiction of either of the high contracting parties," they mean crimes committed within the jurisdiction of one party, and not within a common jurisdiction. Quoting the words, "committed within the jurisdiction of the United States," he says: "Does that mean within the jurisdiction of one party exclusively? I do not say how that would be in the case of a murder committed within the United States by a British subject, over whom we have a personal jurisdiction. * * * This is a question of piracy, which does not depend upon any personal, but on general jurisdiction. * * * Piracy, under the law of nations, is

an offence against all nations, and punishable by all." Mr. Justice Shee, after remarking, that the offence charged was piracy on the high seas, a crime "by the law of nations, justiciable wherever the offender may be found," says: "The persons whose apprehension and extradition are contracted for by the treaty, and authorized by the act of parliament, are persons 'fugitive' from the justice of the United States, and 'seeking an asylum,' that is, (but for the treaty and the act of parliament) safe in the asylum of the territories of our queen, because not liable to be arraigned before her tribunals. The words, 'surrender,' 'deliver up to justice,' mean deliver, from an asylum or place of safety, up to justice, that is, to the ministers of justice of the United States, by whose courts only, on the persons charged with the crimes imputed, justice can be done. Read with reference to the declared object of the treaty and the act of parliament, and by the light which the words 'fugitive,' 'seeking an asylum,' 'surrender,' 'deliver up to justice,' afford, the words, 'within the jurisdiction,' must, as I think, mean, within the exclusive jurisdiction of the United States, and cannot be held to extend to crimes not within any jurisdiction exclusively, but justiciable wherever the person charged with having committed them may be found. It is injurious to suppose that a state should have admitted, in a public treaty, the possibility of its unwillingness or inability to do justice, by binding itself to surrender to the justice of another state persons charged with the commission of crimes which it would be the duty of both to punish, and over which both would have jurisdiction." As, therefore, it is not pretended, in the present case, that the United States has any jurisdiction to punish the crime charged, the ground upon which the court of queen's bench discharged the prisoners before it, is a ground entirely different from any which could be urged in the present case. The dissenting opinion of Chief Justice Cockburn in the case, in favor of holding the prisoners, contains some observations quite apposite to the present question. He says: "It is said, and with truth, that the primary and original mischief which the statutes of extradition meant to prevent, was that of persons committing crimes in one state, and escaping beyond the reach of the law of that state, and so enjoying impunity; and it is also contended, that, for that purpose alone were those statutes passed. That that was their primary and principal object I entertain no doubt, but that that was the only one I entertain great doubt; for, it is impossible not to see, that the mischief which it is the object of all civilized states to prevent, is not limited to such cases. An offence may be cognizable, triable, and justiciable in two places; e. g., a murder of a British subject in a foreign country. A British subject, who commits a murder in the United States of America, may be tried and pun-

ished here by our municipal law, which is made to extend to its citizens in every part of the world. * * * If, therefore, I find the language of a statute large enough to comprehend both instances, it would be highly inexpedient to restrict it to one alone."

Under the treaty of 1842, between the United States and Great Britain, the United States has recognized its obligation to deliver up to Great Britain persons charged with the commission, on the high seas, on board of British vessels, of offences made crimes by the statute law of Great Britain, and not offences against the law of nations. In the case of In re Sheazle [Case No. 12,-734], in 1845, subjects of Great Britain had committed, on board of a British vessel, on the high seas, the crime of piracy, as created by act of parliament, and not piracy under the law of nations. The discharge of the prisoners was sought, on habeas corpus, but it was held, that the case was one within the treaty, and they were remanded to custody, a warrant having already been issued by the department of state for their delivery to the authorities of Great Britain. In the case of In re Bennett, 11 Law T. 488, in 1864, a person charged with having committed the crime of murder, on board of a British vessel, on the high seas, was committed for extradition by a United States commissioner in New York, after an examination. The case of In re Tivnan was there cited, but was held to have no application, on the ground that murder on the high seas, committed on board of a British vessel, was not an offence within the concurrent jurisdiction of both the United States and Great Britain.

In the present case, the language of the treaty is broad enough to cover the extradition asked. When force and meaning are given to the words "fugitives from justice," "deliver up to justice," and "seek an asylum," which are found in this treaty, certainly where the person whose extradition is sought cannot be tried or punished in the territory where he is found, for the crime charged, no reason exists why any court should strain after a construction which would prevent the delivery up of the person to a jurisdiction where he may be tried for the offence, provided the language of the treaty fairly covers the case.

This treaty, and other treaties like it—and nearly all the extradition treaties which we have are modeled upon this treaty with Prussia, and on the previous one with France —are not liable to abuse. In the first place, under this treaty with Prussia, citizens of the United States need not be surrendered. The dignity and authority of the United States are further preserved by the provision, that a person is not to be surrendered who has committed a new crime in the United States, until he has been tried here for it, and been convicted, and suffered the punishment due to it, or been acquitted. Moreover, giving full force to the expressions, "fugitives

from justice," "delivered up to justice," and "seek an asylum," it is not to be supposed that any person will be delivered by the United States in a case where the United States has jurisdiction to punish him for the offence charged. Furthermore, the construction contended for on the part of the government of the German empire may, it is quite evident, be very necessary, in order to enable the United States to execute the laws to which I have referred, extending its jurisdiction over crimes committed outside of the physical, or quasi physical, territory of the United States. The case of Buckley, who escaped into French jurisdiction, is an instance. It might have been necessary, if he had not voluntarily surrendered himself, to demand his extradition by France, on the ground that the offence was committed within the jurisdiction of the United States. Other cases may be supposed, as likely to arise under the acts of August 18th, 1856, and June 22d, 1860, to which I have referred.

The objection may be suggested, that, although the United States has no treaty with Belgium, and would not surrender the prisoner to Belgium, yet the German government may do so, and thus a result may be accomplished indirectly which could not be accomplished directly. But no suspicion as to the good faith of the German government can be indulged; and it is expressly set forth, in the treaty with Prussia, that the laws of Prussia forbid her to surrender her own citizens to a foreign jurisdiction. It is, undoubtedly, on that principle, that Prussia, while she refuses to surrender her own citizens to a foreign jurisdiction, enacts just and proper laws to punish them herself for crimes committed by them in foreign territory.

On this view, of the subject, in all its relations and bearings, I am entirely satisfied, that the present case is within this treaty, and that the writs ought to be discharged, and the prisoner be remanded to the custody of the marshal.

NOTE. After this decision was made, the examination in the matter, before the commissioner, was proceeded with, and resulted in a commitment of the prisoner, to await the issuing of a warrant for his surrender. The secretary of state submitted the question involved to the consideration of the attorney-general, who gave the following opinion: "Department of Justice, Washington, July 21st, 1873. Hon. J. C. B. Davis, Acting Secretary of State: Sir, I have the honor to acknowledge the receipt of your communication of the 7th instant, in which you submit for my official opinion the following question: 'Carl Vogt, a Prussian citizen, charged with the commission of the crimes, murder, arson and robbery, committed in Brussels, in the kingdom of Belgium, is found a fugitive in the United States. Can the German government, under the provisions of the treaty for the extradition of criminals, concluded between the United States and Prussia and other states, June 16th, 1852, rightfully demand the surrender by this government of the fugitive Vogt, in order that he may be tried and punished in Prussia for the offence which he is alleged to have committed in Belgium?' Those parts of the preamble and treaty appli-

cable to this question are as follows: Preamble: 'Whereas, it is found expedient, for the better administration of justice, and the prevention of crime within the territories and jurisdiction of the parties respectively, that persons committing certain heinous crimes, being fugitives from justice, should, under certain circumstances, be reciprocally delivered up, and, also, to enumerate such crimes explicitly; and whereas the laws and constitution of Prussia, and of the other German states, parties to this convention, forbid them to surrender their own citizens to a foreign jurisdiction, the government of the United States, with a view of making the convention strictly reciprocal, shall be held equally free from any obligation to surrender citizens of the United States.' Article 1: 'It is agreed, that the United States and Prussia, and the other states of the Germanic confederation included in, or which may hereafter accede to, this convention, shall, upon mutual requisitions by them, or their ministers, officers or authorities, respectively made, deliver up to justice all persons who, being charged with the crime of murder, or assault with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged papers, or the fabrication or circulation of counterfeit money, whether coin or paper money, or the embezzlement of public moneys, committed within the jurisdiction of either party, shall seek an asylum, or shall be found, within the territories of the other.' You state, that 'the surrender of Vogt is claimed by the German government on the ground that he is a Prussian and a subject of the emperor of Germany: that, by the law of Prussia, at the date of the conclusion of the extradition treaty between the United States and Prussia and other Germanic states, 16th of June, 1852, a Prussian subject, who committed certain crimes (among which those with which Vogt is charged are included) within the territory of another nation, and beyond the territories of Prussia, was, nevertheless, subject to be tried and punished in Prussia. This is, also, now the law of the German empire.' The following appears to be the only point in controversy—whether or not, according to the true intent and meaning of said treaty, the crimes committed by Vogt in the kingdom of Belgium were committed within the jurisdiction of Germany. To affirm that the jurisdiction of Germany, by virtue of its own laws for the punishment of crimes, extends over the territory of Belgium, is necessarily to hold that the same jurisdiction extends to France, Great Britain, and the United States, and, indeed, to every nation and country of the world. Manifestly, the words, 'committed within the jurisdiction,' imply that the crimes named in the treaty may be committed without the jurisdiction of the parties thereto. But, if the crimes committed in Belgium were committed within the jurisdiction of Germany, then it follows, as Belgium is as independent of Germany as any other nation, that it is impossible for crimes to be committed outside of the jurisdiction of the German empire. I think, too, that the treaty clearly contemplates that the fugitive claimed must be a person escaping from the jurisdiction of the party making the claim to the jurisdiction of the other party—recognizing two distinct and independent jurisdictions. But, if the claim of Germany is correct in this case, Vogt is as much within her jurisdiction now as he was when the crimes charged upon him were committed, for, the laws under which she claims have as much force within the United States as they have in Belgium. The laws of Germany, which provide for the punishment there of crimes committed elsewhere by her subjects, imply, ex necessitate, as a condition for the exercise of that power, that such guilty subjects must come, or be conveyed, from a foreign place or jurisdiction where the crimes are committed, to some place where they can be taken or received and held by German au-

thority. Germany has an unquestioned right to punish her subjects, if she chooses, for crimes committed in Belgium or the United States; but, it would not be proper, therefore, to say, that Belgium and the United States are within her jurisdiction; but, it would be proper to say, that she has made provisions to punish her subjects for crimes committed without as well as within her jurisdiction. I am quite clear, that the words, 'committed within the jurisdiction,' as used in the treaty, do not refer to the personal liabilities of the criminal, but to locality. The locus delicti, the place where the crime is committed, must be within the jurisdiction of the party demanding the fugitive. Stress is put upon the supposed difference in the meaning of the words 'territory' and 'jurisdiction,' and it is argued, that the latter is more comprehensive than the former term. This is not necessarily, but probably, so; but, it does not follow that Belgium is within the jurisdiction of Germany. All nations have jurisdiction beyond their physical boundaries. Vessels upon the high seas, and ships-of-war everywhere, are within the jurisdiction of the nations to which they belong. Limited jurisdiction by one nation upon the territory of another is sometimes ceded by treaty, as appears from the treaties between the United States, Turkey, China, Siam, and other powers. Constructive jurisdiction may, possibly, exist in special cases, arising in barbarous countries, or uninhabited places; so that effect can be given to the word 'jurisdiction,' as meaning more than territory, without holding that Germany has jurisdiction over crimes committed in Paris, London, or Washington. Local claims or definitions cannot be allowed to govern this case. When nations discuss and treat of their respective jurisdictions, they do not refer to those duties and responsibilities which a government imposes upon its own citizens, but they contemplate those portions of the earth, and places upon its surface, where they have, respectively, sovereign power, or in other words, the right of government. To recognize the claim of Germany in this case would establish a precedent which might lead to serious international complications. We have no extradition treaty with Belgium, but we have with Great Britain, like that under consideration. Suppose Vogt had committed the crimes with which he is charged in England instead of Belgium, and the British authorities, contemporaneously with Germany, had demanded his extradition on that account, could the United States deny that the crimes were committed 'within the jurisdiction' of Great Britain, and not 'within the jurisdiction' of Germany? Could not Great Britain justly complain, if, after the murder of her citizens and the destruction of her property by the fugitive, her claim to him for the purposes of justice should be denied by the United States, and he should be turned over for trial to Germany, where there is no evidence of his guilt, and where his friends and sympathizers, if he has any, may be supposed to be? Law-writers generally define the jurisdiction of a court to be the power to hear and determine a cause, and it is argued, that, as, by the laws of Germany, her courts have power to hear and determine the case of Vogt, therefore, his crimes were committed within her jurisdiction. One conclusive answer to this view is, that the word 'jurisdiction,' in the treaty, is not used with reference to governmental power over the subjects of judicial procedure, but with reference to the territory and places in which that power may be exercised. Again, the courts of Germany have never had the power to hear and determine the case of Vogt. Jurisdiction over a subject is one thing. That is conferred by law. Jurisdiction over the person is another. That is a fact which has never existed in this case. Whether the courts of Germany will or not hereafter acquire jurisdiction in Vogt's case depends upon facts hereafter to arise. Ger-

many and the United States intended that the convention in question should be 'strictly reciprocal:' but, if Germany can rightfully demand the delivery up by the United States of her citizens or subjects for crimes committed in Belgium, the convention is not reciprocal; for, the United States cannot demand of Germany the delivery up of their citizens for crimes committed in Belgium. There is not a single crime enumerated in the treaty for the commission of which outside of this country the United States can claim one of their citizens from Germany; and there is not only no probability that congress will ever pass an act to that end, but its constitutional power to do so is doubted. Reference has been made to the act of congress of August 18th, 1856, which declares that perjury committed before a secretary of legation or consular officer of the United States in a foreign country, may be prosecuted and punished in this country, as though committed here; and this, it is said, shows that the United States, as well as Germany, claim an extraterritorial jurisdiction. There seems to be no point in this reference. According to international law, the domicil of an ambassador, minister extraordinary, or consul, is a part of the territory he represents, for many purposes; but, independent of this, the question here is not whether a sovereign country may not punish persons coming into its hands for crimes committed in another sovereignty, but the question here is, whether a crime committed upon the admitted territory, and within the exclusive government, of an independent nation, is committed within the jurisdiction of another nation. To facilitate the punishment of crime is desirable, but the United States cannot, with dignity and safety, admit that any foreign power can acquire jurisdiction of any kind within their territory by virtue of its local enactments. Objection is made to this construction of the treaty, on the ground that it will make the United States an asylum for European criminals. But, this objection is not matter of law, nor is it true as matter of fact; and, if it was, the United States, as an act of comity, may deliver up a fugitive from justice, or the subject may be regulated by an extradition treaty as comprehensive as the parties thereto see proper to make it; or, if it should appear necessary, congress might possibly interpose by legislation. To recognize the claim to jurisdiction accompanying the requisition in this case may open the door to confusion and controversy as to claims of jurisdiction in other respects, made, under their local laws, by foreign governments. The plain and practical rule upon the subject seems to be, that the jurisdiction of a nation is commensurate with, and confined to, its actual or constructive territory, excepting changes made by agreement, and to this effect are the authorities. Three of the judges of the queen's bench, in Tivnan's Case, 5 Best & S. 645, upon application by the United States for Tivnan, charged with the crime of piracy committed upon an American ship on the high seas, and a fugitive from justice in England, made under our extradition treaty of 1842 [8 Stat. 576], with Great Britain, held, that the words 'within the jurisdiction,' in said treaty, meant, within the exclusive jurisdiction of the United States, and did not apply to cases of piracy on the high seas, as the person charged therewith was justiciable in any country where he was found. Chief Justice Cockburn, in his dissenting opinion, thought that the term 'jurisdiction' meant, the area, whether by land or water, over which the law of a country prevails, and said that 'it is admitted that a ship is part of the territory of the state, or, at all events, that this ship' (referring to the one on which the piracy was committed) 'was within the jurisdiction of the United States, so as to come within the statute.' Thomas Allsop, a British subject, was charged as an accessory before the fact, to the mur-

der of a Frenchman in Paris, in 1858, and escaped to the United States, and, as he was punishable therefor by the laws of Great Britain, the question as to whether he could be demanded by Great Britain of the American government, under the extradition treaty of 1842, was submitted to Sir J. D. Harding, queen's advocate, the attorney- and solicitor-general, Sir Fitzroy Kelly, since chief baron of the exchequer, and Sir Hugh McC. Cairns, since lord chancellor, and they recorded their judgment as follows: 'We are of opinion that Allsop is not a person charged with the crime of murder committed within the jurisdiction of the British crown, within the meaning of the treaty of 1842, and that his extradition cannot properly be demanded of the United States under that treaty.' Forsyth's Cases, p. 368. This is a decision exactly in point, and of high authority. Phillimore, in his work on International Law, volume 1, page 413, says: "There are two circumstances to be observed, which occur in these and in all other cases of extradition: (1) That the country demanding the criminal must be the country in which the crime is committed; (2) that the act done, on account of which his extradition is demanded, must be considered as a crime by both states.' Wharton, in his work on the Conflict of Laws, section 957, says: "The only admissible restriction of the term "jurisdiction" is, to treat it as convertible with "country," and to hold that no requisition lies for an offence not committed within the country of the requiring state. And this view is not without support in those expressions of the treaties which speak of the persons claimed as "fugitives," and as "seeking an asylum" in the state on whom the requisition is made, implying, as it were, a change of country.' David Dudley Field, Esq., in his Outlines of an International Code (page 93), speaking of an article proposed on extradition, says: 'The article in its present form defines the right of extradition as it is now recognized, and extending only to crimes committed within the jurisdiction of the demanding nation. It may be thought desirable to extend the rule to offences against the law of a nation committed beyond its jurisdiction, which it would have power to punish if the offender comes within its jurisdiction.' Attorney-General Lee, in construing the 27th article of the treaty of 1794 [8 Stat. 129] with Great Britain, says, that it was 'confined expressly to persons who are charged with murder or forgery committed within the jurisdiction of either nation, and who seek refuge in the other, meaning their territorial jurisdiction respectively.' 1 Op. Attys. Gen. 83. Our extradition treaty of 1843 with France provides for the delivery up of persons charged with certain crimes committed within the jurisdiction of the requiring party, and Attorney-General Cushing held that a requisition by the French government upon the United States for a fugitive under this treaty must show that the crime was committed by the fugitive while actually in France. 8 Op. Attys. Gen. 215. Courts in this country have held, that, under section 2, art. 4, of the constitution, providing for the reclamation, by one state upon another, for fugitives from justice, the requisition must show that the crime was committed within the territory of the requiring state. Ex parte Smith [Case No. 12,968]; Ex parte Heyward, 1 Sandf. 701. I have carefully read the elaborate opinion of Judge Blatchford, upholding the jurisdiction of Germany in this case, transmitted in your letter, but, with diffidence and regret, I am compelled to dissent from his views. They do not appear to me to be sound in principle or sustained by authority. Able writers have contended that there was a reciprocal obligation upon nations to surrender fugitives from justice, though now it seems to be generally agreed that this is altogether a matter of comity. But, it is to be presumed, where there are treaties upon the subject, that fugitives are to be surrendered only in cases and upon the terms specified in such treaties. Conformably to what is above stated, I make a negative answer to your question. I have the honor to be very respectfully, your obedient servant, Geo. H. Williams, Attorney-General." The department of state, in reply to the application made by the German minister for the extradition of the prisoner, addressed to him the following communication: "Department of State, Washington, 25th July, 1873. Sir: In reply to the application made by you, on the 2d instant, in behalf of the government of Germany, for the extradition, under the treaty of June 16, 1852, between the United States of America and Prussia and other states of the Germanic confederation, of Stupp alias Carl Vogt, an alleged criminal, I have the honor to state that the case has received the serious consideration of this government, and has been submitted to the department of justice for the opinion of the legal advisers of the government. I have also felt it due to the importance of the question, and a proper act of courtesy to your government, to submit all the papers to Mr. Fish, and to take his instructions regarding the disposition of the case. It appears that the crimes of which Stupp alias Vogt is accused were committed in Brussels, in the kingdom of Belgium, without the territory, and outside of the jurisdiction, of the states parties to the treaty. The preamble of the treaty declares its object to be 'the better administration of justice, and the prevention of crime within the territories and jurisdiction of the parties respectively.' It does not propose to regulate the administration of justice, or the prevention of crime, in other territories, or within the jurisdiction of other states, than those parties to the treaty. The first article of the treaty provides for the delivery up to justice, by the parties respectively to the treaty, of persons charged with certain enumerated crimes, 'committed within the jurisdiction of either party.' The crimes charged against Stupp alias Vogt are such as are enumerated in the treaty, and, had they been committed within the territories and jurisdiction of either of the states, parties to the treaty, there would be no hesitancy or delay on the part of this government in the delivery of the alleged criminal. They were not, however, committed within the territories or jurisdiction of Germany, but, as I have already noted, within the territory and jurisdiction of Belgium, with which state no treaty of extradition with the United States exists. The opinion of the law department of the government, therefore, is, that the case of Stupp alias Vogt is not within the contemplation and provisions of the treaty. The heinous nature of the crimes charged against Vogt has inclined this government to seek some construction of the treaty which might justify the surrender of the alleged criminal, for the purpose of subjecting him to an impartial trial, and to the punishment, which, if guilty, he so richly merits. But it is forced to the conclusion that the treaty does not contemplate crimes committed elsewhere than within the territorial and exclusive jurisdiction of the parties thereto, and does not provide for the surrender of persons charged with crimes committed outside of such jurisdiction. Anxious as is this government, at all times, to aid in the administration of justice and the prevention of crime, and desirous as it has ever shown itself to be to comply with the wishes of the government which you so ably represent, it is with great regret that it finds itself constrained by the terms of the treaty in this case, and that it cannot grant the warrant of surrender which is asked. I avail myself of this occasion, &c., J. C. B. Davis, Acting Secretary." The prisoner not having been delivered up within two calendar months after his final commitment, an application was, under the fourth section of the act of August 12, 1848 (9 Stat. 302), made to Judge Blatch-

ford. on notice to the secretary of state, to discharge the prisoner out of custody, and he was discharged.

[Subsequently a treaty of extradition was concluded with Belgium, and Stupp was arrested upon demand of the Belgian authorities. He sued out a writ of habeas corpus, but upon the hearing on the return the writ was discharged, and he was remanded to the marshal. Case No. 13,563.]