Anthony J. LOBUE, Plaintiff,

v.

Warren CHRISTOPHER, Secretary of State, Defendant.

No. CA 95–1097.

United States District Court, District of Columbia.

Aug. 31, 1995.

Gregory B. Craig, James W. Shannon, John T. Parry, Matthew J. Herrington, Williams & Connolly, Washington, DC, for plaintiff.

Sara Criscitelli, Manual Rodriguez, Richard Brown, U.S. Dept. of Justice, Washington, DC, for defendant.

### MEMORANDUM OPINION AND ORDER

LAMBERTH, District Judge.

This case presents a challenge to the constitutionality of the United States' extradition statute. The government of Canada has charged the plaintiffs with kidnapping and

now seeks to have them extradited from the United States to Canada to stand trial. Plaintiffs contend that the extradition statute purports to confer upon the Secretary of State the power to review and set aside the legal conclusions of federal extradition judges and is therefore unconstitutional. Upon careful consideration of the text of the statute, the filings and arguments of counsel, and of the relevant authorities, the court must agree. Accordingly, plaintiffs' cross-motion for summary judgment will be granted, and the United States will be enjoined from taking any further act towards executing the surrender warrants signed by Deputy Secretary of State Strobe Talbott on May 2, 1995.

## I. Background

Plaintiffs Anthony Lobue and Thomas Kulekowskis have been charged by the Canadian government with kidnapping. The charges arise out of plaintiffs' efforts to assist one Anthony De Silva in his attempt to retrieve his physically and mentally disabled wife, Tammy, from her parents' home in Winnipeg, Canada. The attempt ultimately failed, but during the process, Tammy's parents had reported to Canadian authorities that she had been kidnapped by a group of people including the plaintiffs. Canadian police investigated the incident and, with Tammy's apparent support, filed kidnapping charges against the participants.

Pursuant to the extradition treaty between the United States and Canada, the Canadian government requested surrender of the plaintiffs for prosecution on the kidnapping charge. The Secretary of State forwarded this request to the appropriate United States Attorney, and a complaint for extradition was filed in the United States District Court for the Northern District of Illinois on February 18, 1994. On May 27, 1994, Magistrate Judge Edward A. Bobrick held a hearing on the extradition request; on March 28, 1995, Magistrate Judge Bobrick issued an Order and Certification of Extraditability as to plaintiffs Lobue and Kulekowskis.

Plaintiffs requested a stay of surrender date pending the filing of a *habeas corpus* petition. This request was granted, and Magistrate Judge Bobrick issued an Order staying plaintiffs' date of surrender until May 25, 1995. Despite the existence of this Order, on May 2, 1995, Deputy Secretary of State Strobe Talbott signed surrender warrants authorizing plaintiffs' extradition to Canada. These warrants were not executed, however, "in light of the stay order." Gov't Mem. in Supp.M.Dis. at 3.

Plaintiffs filed their *habeas* petition in the Northern District of Illinois on May 24, 1995. A briefing schedule has been set in that case which enables the plaintiffs to obtain a ruling from this court before proceeding further with their *habeas* action in Illinois. The government has agreed to take no further steps towards extraditing the plaintiffs to Canada until September 1, 1995, or until this court has issued its ruling in the present case, whichever date is earlier. Now before the court are the parties' cross-motions for summary judgment and plaintiffs' class-certification motion.

## II. Analysis

### A. The Extradition Statue

▮▮ Extradition procedure in the United States is governed by 18 U.S.C. §§ 3181–3195. Section 3184 sets forth the procedure for extraditing an individual from the United States to a foreign country where he has been charged with committing a crime.[1] Un-

---

1. 18 U.S.C. § 3184 provides:

Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. Such complaint may be filed before and such warrant may be issued by a judge or magistrate of the United States District Court for the District of Columbia if the whereabouts within the United States of the person charged are not known or, if there is reason to believe the person will shortly enter the United States. If

der this scheme, a federal extradition judge [2] conducts a hearing, receives evidence, and issues a legal ruling concerning the extraditability of the accused. In order to certify an individual as extraditable, the judge must find that (1) the offense charged is extraditable under the applicable treaty; (2) the offense satisfies the so-called "dual criminality" requirement (*i.e.*, the conduct alleged is unlawful both in the requesting country and in the United States); and (3) there is probable cause to believe that the accused committed the crime for which he is sought. *E.g., Spatola v. United States*, 741 F.Supp. 362, 363 (E.D.N.Y.1990); *aff'd* 925 F.2d 615 (2nd Cir. 1991). If the extradition judge finds that any of these requirements has not been met, he does not certify the accused as extraditable, and the individual is released. If, on the other hand, the judge concludes that each of these criteria has been met, he or she certifies this finding to the Secretary of State, "that a warrant *may* issue." 18 U.S.C. § 3184 (emphasis supplied).

■ Once a federal extradition judge has certified an individual as extraditable, § 3184 commits to the Secretary of State's sole discretion the decision whether to complete the extradition process by signing a warrant of surrender. There is no question that, assuming the legal requirements have been met, the ultimate decision whether to surrender an individual to the government of a foreign country for criminal prosecution rests with the Executive branch. The question presented by this case is whether a statute may confer upon the Secretary of State the authority to review the legal determinations of federal extradition judges. Upon consideration of the relevant authorities, the court

finds that, while the statute certainly purports to grant the Secretary this power, it is a power which the Constitution forbids him from exercising.

### B. The Nature of the Secretary's Review

■ The first question is whether the extradition statute confers upon the Secretary of State the authority to review the legal conclusions of extradition judges. Notwithstanding the government's protestations to the contrary, this is an easy question. The text of the statute, the consistent manner in which it has been interpreted by all three branches of government, and historical practice confirm that the answer is clearly yes— the statute does purport to give the Secretary of State the authority to review the legal findings of extradition judges.

First, the statute states that, if the extradition judge "deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, *he shall certify the same, together with a copy of all testimony taken before him,* to the Secretary of State...." 18 U.S.C. § 3184 (emphasis supplied). There is simply no plausible explanation for why Congress would require the extradition judge to certify the evidence "together with a copy of all the testimony taken before him," other than to permit the Secretary to perform his own independent review of the legality of the extradition.

In fact, this is precisely the conclusion reached by the Solicitor General in a legal memorandum prepared at the request of the Secretary of State. As summarized by the Solicitor General, the Secretary's question was "how far executive discretion extends in

on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

**2.** The term "federal extradition judge" encompasses the three types of judicial officers listed in

§ 3184: Article III federal judges, United States magistrates, and certain state court judges. In practice, state court judges are rarely, if ever, called upon to conduct extradition hearings. The court notes that plaintiffs' separation-of-powers challenge would not appear to be viable in a proceeding in which the extradition hearing had been conducted by a state court judge rather than a member of the federal Judiciary. However, because plaintiffs' hearing was conducted by a United States magistrate and not by a state court judge, the court expresses no view on the matter.

reviewing the judgment and testimony directed by the statute ... to be certified before [the Secretary] by the judicial officer who hears the charge in the first instance." 17 U.S.Op. Att'y Gen. 184, 185 (1881). In analyzing the extradition statute, the Solicitor General observed that "[i]t is difficult to see why the judicial officer should certify the testimony before him as well as his judgment thereon, unless for the purpose of affording an opportunity for a reconsideration of the effect of that testimony." *Id.* at 185–86. The Solicitor General's interpretation of the statute was forthright and unambiguous: "I am of the opinion that the proceedings below come before you upon a quasi certiorari, and that your discretion extends to a review of *every question therein presented.*" *Id.* at 185 (emphasis supplied).[3]

It is quite clear that, when they have specifically considered the issue, all three branches of government have consistently taken the position that the Secretary's review of extradition proceedings extends to the legal conclusions of the extradition judge. *See e.g.,* S.Rep. No. 82, 47th Cong., 1st Sess. 3 (1882) ("[T]he judiciary can neither order the delivery [of the requested person] nor bind the action of the President.... [The Executive has] the power of reviewing all the proceedings and passing judgment upon their correctness. If the President deem these judicial proceedings *illegal or defective in any respect* he may decline to deliver the prisoner") (emphasis supplied); 3 Dep't State Legal Advisor Op. 2356, 2367 (1931) ("The Secretary of State in determining whether he should authorize the surrender [of the requested person] is not bound by the finding of the ... courts. He may review the evidence and reach an entirely different conclusion"); *Ornelas v. Ruiz,* 161 U.S. 502, 508, 16 S.Ct. 689, 691, 40 L.Ed. 787 (1896) (noting that the extradition judge "is to certify his

findings on the testimony to the Secretary of State that the case may be reviewed by the Executive Department of the government"); *see also In re Heilbronn,* 11 F.Cas. 1025, 1031 (S.D.N.Y.1854) (No. 6,323) (observing that "no one can revise the opinion of the [extradition judge] but the President. *The President has that power*") (emphasis supplied).

Finally, the available historical evidence clearly demonstrates that Secretaries of State have, in the past, reviewed and set aside the legal conclusions of extradition judges. Perhaps the clearest example of this practice occurred in the case of *In re Stupp,* 23 F.Cas. 281 (C.C.S.D.N.Y.1873) (No. 13,-562) ("*Stupp I*"). The issue presented to the extradition judge in *Stupp I* was whether the accused, Joseph Stupp, was properly extraditable to Prussia in light of the fact that the conduct with which he was charged occurred in Belgium, while the United States–Prussia extradition treaty permitted extradition only for crimes committed within the jurisdiction of the requesting country. *Id.* at 284. Following a lengthy and detailed analysis of the question, Judge Blatchford concluded that Stupp was extraditable under the terms of the treaty. *See id.* at 293. Judge Blatchford certified this conclusion to the Secretary of State, who then sought an opinion from the Attorney General as to the legality of the requested extradition. Contrary to Judge Blatchford's determination, the Attorney General found that the conduct with which Stupp was charged had *not* taken place within the "jurisdiction" of Prussia, and that Stupp was therefore not legally extraditable. *See id.* at 295. On the basis of the Attorney General's conclusion, the Secretary of State refused to issue a warrant of surrender.[4]

Apparently, it is unusual for the Secretary to refuse an extradition request once a judge or magistrate has certified a requested per-

---

**3.** *See also id.,* at 187 ("I am of the opinion that the law gives to the party charged the double protection of a concurrence of views upon all questions affecting his guilt under the treaty by the magistrate and the Secretary before he is to be surrendered."). While such "double protection" might well be a desirable feature to include in the extradition scheme, it may not be achieved in a manner which violates the Constitution. *See Mistretta v. United States,* 488 U.S. 361, 427, 109 S.Ct. 647, 683, 102 L.Ed.2d 714 (1989) (Scalia,

J., dissenting) ("[T]here are many desirable dispositions that do not accord with the constitutional structure we live under. And in the long run the improvisation of a constitutional structure on the basis of currently perceived utility will be disastrous.").

**4.** *See In re Stupp,* 23 F.Cas. 296, 301 (C.C.S.D.N.Y.1875) (No. 13,563) ("*Stupp II*").

son as extraditable. Moreover, the Secretary of State is obviously never obligated to state his reasons for denying extradition. It is therefore not always clear what the true basis for the Secretary's decision not to extradite a given individual really was. Nevertheless, the historical data assembled by various commentators demonstrates that when past Secretaries of State have offered reasons for denying extradition of an individual who has been certified by the Judiciary as extraditable, they have frequently cited concerns regarding the *legality* of the extradition.[5]

In the face of this overwhelming evidence that the Secretary of State does in fact subject the legal determinations of extradition judges to Executive branch review, the position taken by the government in its briefing has been strained, at best. The government contends that "the Secretary of State does not 'revise' the judicial finding that extradition is lawful and he does not sit as a 'court of error' to reconsider and correct the extradition judge's conclusions." Gov't Reply at 8. The government further maintains that the extradition judge's determination "is not an 'advisory' decision, it is a final judicial resolution of the matter that the statute assigns specifically to the judicial officer. The judge's decision is conclusive and binding on that issue: *i.e.*, whether the requested extradition is *lawful*." *Id.* at 12 (emphasis in original). How the government can possibly reconcile these statements with the evidence

set forth above is unclear. Nor is it clear how the government would distinguish cases such as *In re Stupp*—it makes no effort whatever to do so in its papers, and at oral argument, counsel's explanation was essentially to say, "Well, those are old cases."[6]

Whether the Secretary of State has *recently* subjected the legal determinations of the Judiciary to Executive branch review, however, is not the question. The question is whether the statute itself purports to confer upon the Secretary the discretion to do so. The evidence set forth above—including the text, analysis, and historical application of the statute—clearly demonstrates that the extradition statute does purport to confer upon the Secretary of State the authority to review the *legal* determinations of extradition judges. It is equally clear that the Executive branch has, in the past, declined to surrender accused persons for the specific reason that the requested extradition was not legal and that the extradition judge's contrary conclusion was erroneous. The only remaining question then, is whether this Executive branch review renders the statute unconstitutional.

C. Executive Branch Review of an Extradition Judge's Legal Determinations Is Unconstitutional

Plaintiffs maintain that the extradition statute requires the courts to issue non-final, non-binding "advisory opinions" which are subject to review and revision by the Execu-

---

**5.** *See* Note, *Executive Discretion in Extradition,* 62 Colum.L.Rev. 1313 (1962) (citing examples of Executive branch review and concluding that the role of the Secretary of State "is really one of conducting a de novo examination of the case to determine whether the requirements of the treaty have been met"); *see also* 4 Michael Abbell & Bruno A. Ristau, *International Judicial Assistance* 260 (1990) ("On only two occasions since 1950 has the Secretary declined to issue a warrant for the surrender of a person found extraditable. In each of those instances he based his refusal on a disagreement with the courts as to whether the treaty permitted extradition, not on his power to deny extradition for unspecified reasons.").

**6.** See August 11, 1995, Transcript of Hearing (hereinafter Tr.) at 50–51, wherein government counsel observed that "there are no current examples where the Secretary of State looks at [a certification of extraditability] and says, 'No, I

don't believe' [the extradition judge reached the proper conclusion]." Counsel further maintained that because its area of expertise is limited to foreign policy matters, the State Department's "considerations are quite obviously not judicial considerations." *Id.* at 51. Finally, counsel suggested that if State Department officials *were* making such determinations, "they might call upon the Department of Justice or the Attorney General to assess whether [a given request] in fact makes out a sufficient case for extradition.... But it's not. *It's strictly foreign policy*." *Id.* (emphasis supplied). The latter assertion—that the Secretary's decision is based purely on foreign policy considerations—simply cannot be reconciled with the considerable historical evidence which clearly establishes that past Secretaries of State have based particular decisions not to extradite on their independent determinations that the law did not permit it.

tive branch. The statute is therefore unconstitutional, say the plaintiffs, because "Congress cannot vest review of the decisions of Article III courts in officials of the Executive branch." *Plaut v. Spendthrift Farm, Inc.,* — U.S. —, —, 115 S.Ct. 1447, 1453, 131 L.Ed.2d 328 (1995). The government counters that the extradition statute strikes a reasonable balance between the due process rights of the accused, on the one hand, and significant foreign policy interests of the United States (including compliance with treaty obligations, comity, and mutual law enforcement assistance), on the other. Rather than impermissibly "intermingling" the powers of the Executive and the Judiciary, the extradition statute creates a " 'twilight area' wherein 'the activities of the separate Branches merge.' " Gov't Reply at 14 (quoting *Mistretta v. United States,* 488 U.S. 361, 386, 109 S.Ct. 647, 662, 102 L.Ed.2d 714 (1989)).[7] In addition, the government notes that the procedures by which the United States performs extraditions have been in place for over 150 years and have never been questioned by any court.

### 1. Extradition Judges' Decisions Are Neither Binding Nor Final

 The government's contention that extradition judges' decisions are final and binding upon the parties is insupportable. In the first instance, if an extradition judge determines that a particular extradition request may not lawfully be granted, this decision is not legally binding upon either the government or the accused. The government may not appeal the decision; in fact, there is no provision whatever in the current extradition scheme for judicial appeal of any kind.[8] More importantly, however, the extradition judge's determination of non-extra-

ditability has no *res judicata* effect. *Collins v. Loisel,* 262 U.S. 426, 429–30, 43 S.Ct. 618, 619, 67 L.Ed. 1062 (1923); *Hooker v. Klein,* 573 F.2d 1360, 1364–65 (9th Cir.1978). There appears to be no legal limit on the number of times extradition proceedings may be brought against the same individual on the same charges. *See Collins,* 262 U.S. at 429–30, 43 S.Ct. at 619 ("Protection against unjustifiable vexation and harassment incident to repeated arrests for the same alleged crime must ordinarily be sought, not in constitutional limitations or treaty provisions, but in a high sense of responsibility on the part of the public officials charged with duties in this connection.") Certainly a prisoner who found himself facing trial in a foreign country following multiple extradition proceedings in this country would dispute the government's contention that the original magistrate's determination of nonextraditability was "binding."

In the second instance, it is quite clear that if an extradition judge does certify a given defendant as extraditable, under the current scheme the Secretary of State may review the judge's legal conclusions. If the Secretary disagrees with the these conclusions, historical practice indicates that he may well decline to extradite the person for the express reason that it would be unlawful to do so. How then can it be said that the extradition judge's ruling on the issue of extraditability was binding? During an extradition hearing the Executive branch essentially "stands in the shoes" of the requesting nation, and United States Attorneys in effect represent the interests of the country which seeks to obtain custody of the accused.[9] When viewed in this manner, it is clear that the judge's certification of extraditability is

---

7. *Mistretta* involved a challenge to the constitutionality of the Sentencing Reform Act of 1984. The Sentencing Reform Act created the United States Sentencing Commission, an independent body within the Judicial branch consisting of seven voting members, at least three of whom are federal judges. The Supreme Court rejected Mistretta's separation-of-powers argument and sustained the Act.

8. Of course, review by writ of *habeas corpus* is available to one who has been found to be extraditable. This form of relief is limited, however. As explained by the Supreme Court, "*[H]abeas*

*corpus* is available only to inquire whether the magistrate had jurisdiction, whether the offence charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925).

9. *See e.g., Wacker v. Bisson,* 348 F.2d 602, 605 (5th Cir.1965) (noting that the country requesting extradition is "the real party in interest").

not binding on the parties because one "party"—the requesting nation—is denied satisfaction by virtue of the Secretary's later disagreement as to the *legality* of the extradition. A foreign country (Prussia, for example, in the case of *In re Stupp*) which had requested the extradition of a particular individual and which had been told by the Secretary of State that the extradition could not lawfully be performed certainly would not agree with the government's assertion that the extradition judge's ruling on this issue was "binding."

In sum, it is simply idle to contend that the decisions of extradition judges are binding. Not only may a failed extradition request be brought again and again until a judge is found who will certify the requested party as extraditable, the Secretary of State can and does purport to review the legal determinations of extradition judges. Under the present scheme, a judge's determination of extraditability "binds" nothing.

### 2. Extradition Judges' Decisions Are Subject to Executive Review

The overwhelming evidence of Executive branch review is set forth above and need only be summarized here. Upon his finding of extraditability, the statute commands the judge or magistrate to "certify" to the Secretary of State the evidence upon which he based this conclusion and to forward to the Secretary "a copy of all the testimony taken before him." 18 U.S.C. § 3184. Must the extradition judge forward to the Secretary of State the evidence upon which he based his decision in order to assist the Secretary in making a *purely* foreign policy-based decision? Improbable though it may seem, this appears to be the final position of the government.[10] This contention, however, simply strains credibility—a fair-minded reading of the statute makes clear that its drafters fully intended that the Secretary of State have the ability to review the legal conclusions of the extradition judge. And indeed, as revealed both by its own interpretations and by historical practice, this has been precisely the Executive's understanding of its role under the extradition statute.

### 3. Similar Statutes Have Not Survived Separation-of-Powers Analysis

The Supreme Court has rebuffed prior attempts by Congress to create a scheme whereby the Judicial branch renders a preliminary legal ruling which the Executive may then accept or ignore. That such a regime violates constitutional separation-of-powers principles is apparently so obvious that the cases cited by plaintiffs are well over 100 years old. The cases upon which plaintiffs principally rely are *Hayburn's Case* 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792); *Gordon v. United States*, 69 U.S. (2 Wall.) 561, 17 L.Ed. 921 (1865); and *United States v. Ferreira*, 54 U.S. (13 How.) 40, 14 L.Ed. 40 (1852).

The statute at issue in *Hayburn's Case* required federal judges to investigate and "certify" to the Secretary of War the eligibility of particular Revolutionary War veterans to receive pensions. The Secretary then exercised his own discretion in deciding whether to place eligible persons on the list of pension recipients. Chief Justice Jay and Justice Cushing, sitting as Circuit Judges, held:

> That neither the Legislative nor the Executive branches, can constitutionally assign to the judicial any duties, but such as are properly judicial, and to be performed in a judicial manner.

> That duties assigned to the circuit courts, by this act, are not of that description, and that the act itself does not appear to contemplate them, as such; in as much as it subjects the decisions of these courts, made pursuant to those duties, first to the consideration and suspension of the secretary at war, and then to the revision of the Legislature; whereas, by the constitution, neither the secretary at war, nor any other executive officer, nor even the Legislature, are authorized to sit as a court of errors on the judicial acts or opinions of this court.

---

**10.** *See* Tr. at 51 (arguing that, in extradition proceedings, the Secretary of State's "consider-ations are quite obviously *not* judicial considerations") (emphasis supplied).

2 U.S. (2 Dall.) at 410 n. 2.[11]

The Court reached a similar conclusion in analyzing the original statute which created the Court of Claims. In *Gordon,* 69 U.S. (2 Wall.) at 561–62, the Supreme Court found that the statute's grant of power to the Executive branch to "revise all the decisions of [the Court of Claims] requiring payment of money, denies to it judicial power from which alone appeals can be taken to this court." Finally, *Ferreira,* 54 U.S. (13 How.) 40, involved a statute which required federal judges to evaluate the claims of Spanish inhabitants of Florida who had been harmed as a result of American army operations during the Spanish–American war. If the judge found in favor of a given claimant, the judge was to report his finding—*along with the evidence upon which he based his conclusion* [12]—to the Secretary of the Treasury, who would then independently review the validity of the claim. The Supreme Court found that, under the statute, the judge's decision was not an exercise of judicial power, and the Court was therefore without jurisdiction to hear the appeal before it. *Id.* at 51.

The function which Congress purported to assign to the courts in *Hayburn, Gordon,* and *Ferreira* is virtually identical to the role of the courts under the current extradition scheme. In each, judges are placed in the position of "suggesting" to the Executive branch that a given course of action is lawful. The Executive may then make its own determination as to the legality of the proposed act and decide whether to follow through.

The government attempts to distinguish these cases by describing the role of the judges in *Hayburn,* etc., as the "rough equivalent of claims adjustors" who were to make "recommendations to the executive branch" as to the validity of certain claims. According to the government, extradition judges, by contrast, do not "advise, propose, encourage or advocate executive action; [they] simply

find[ ] lawful . . . the detention and surrender of a fugitive. The extradition judge's decision is not thereafter revised, overturned, or refused faith and credit by the executive branch." Gov't Reply at 15–16.(internal quotations and citation omitted). It is unclear what the government believes the Secretary of State was doing, for example, when he asked the Attorney General for his opinion as to the extraditability of Mr. Stupp; in declining to extradite Mr. Stupp on the grounds that he could not lawfully do so, the Secretary apparently did not, in the government's view, "revise or refuse faith and credit" to Judge Blatchford's certification of extraditability. This is simply untenable; the court finds the government's attempt to distinguish *Hayburn, Gordon,* and *Ferreira* wholly unpersuasive.

### 4. Foreign Policy Concerns Do Not Legitimate the Otherwise Unconstitutional Commingling of Powers

■ The government notes that, unlike the decision whether to pay benefits or honor monetary claims, extradition involves political and foreign policy judgments which are uniquely within the purview of the Executive branch. This is certainly true. The decision whether to extradite a particular person clearly entails political and foreign policy considerations which are beyond the competence of the Judicial branch. Thus, the government is quite correct that the Judiciary could never compel a given extradition; the Secretary may always decline to extradite an individual whom the Judiciary has found to be lawfully extraditable. The government appears to conclude, however, that because the Secretary of State enjoys full discretion to decline to extradite, any extradition scheme must, *ipso facto,* confer upon him the authority to review judicial determinations of extraditability. This is incorrect.

■ The Executive branch is under no obligation whatever to offer specific reasons for decisions which are committed to its sole

---

**11.** Because Congress repealed the underlying statute, the issue presented in *Hayburn's Case* was mooted before it ever reached the Supreme Court. Nevertheless, the opinions reported in *Hayburn's Case* have been accorded precedential value by the Supreme Court. *See e.g., Morrison v. Olson,* 487 U.S. 654, 678 n. 15, 108 S.Ct. 2597,

2612 n. 15, 101 L.Ed.2d 569 (1988); *Mistretta v. United States,* 488 U.S. 361, 402, 109 S.Ct. 647, 670–71, 102 L.Ed.2d 714 (1989).

**12.** Compare 18 U.S.C. § 3184.

discretion, and no court could ever compel the Secretary of State to explain his decision not to accede to an extradition request which the courts have found to be lawful. At the same time, however, no statute may confer—and the Executive may not purport to wield—the power to review and set aside determinations which are constitutionally committed to the Judicial branch. Under the present extradition scheme, the *legality* of performing a given extradition is such a determination. If, based upon its consideration of political and foreign policy issues that are committed to its discretion, the Executive branch chooses not to honor a particular extradition request, that is its prerogative. The Executive may not, however, perform—and purport to rely upon—its own independent analysis of the extradition judge's *legal* conclusions. To do so is to subject the legal determinations of the Judiciary to Executive branch review, which is unconstitutional. *See Plaut,* —— U.S. at ——, 115 S.Ct. at 1453.[13] Any statute which purports to confer such authority upon a member of the Executive branch is necessarily void upon its face.

5. For Separation-of-Powers Purposes, the Procedure Under the Extradition Statute is Not Comparable to Preliminary Judicial Rulings in Criminal Cases

The government seeks to analogize the role played by courts under the extradition statute to the various preliminary rulings rendered by judges and magistrates in criminal proceedings.[14] Thus, the government contends that the extradition judge's certification of an individual as extraditable parallels a judge or magistrate's ruling that probable cause exists to execute a search or to make an arrest. Just as law enforcement officers retain discretion to decide whether to go ahead and execute the warrant issued by the magistrate in a criminal proceeding, so too does the Secretary of State retain the discretion to decide not to complete an extradition.

Admittedly, the government's analogy has a certain facial appeal. Upon closer consideration, however, the flaw in the analogy becomes clear. Unlike a certification of extraditability, when a judge or magistrate issues a finding of probable cause in a criminal proceeding, this is simply the first of several opportunities the Judiciary has to determine whether the search or arrest was, in fact, supported by probable cause. The Judiciary alone retains the power to resolve this question, from a pretrial suppression hearing all the way to the defendant's final appeal. The government contends that this is not so—after all, once they have secured a warrant, law enforcement officials could later decide that the proposed search or arrest is unlawful and decline to undertake it on that basis. This example of the Executive branch making its own determination of the legality of a particular undertaking is identical, says the government, to the Secretary's discretion under the extradition statute. This is incorrect.

---

**13.** *See also Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948) ("But if the President may completely disregard the judgment of the court, it would only be because it is one the courts were not authorized to render. Judgments within the powers vested in courts by the Judiciary Article of the Constitution may not lawfully be revised, overturned or refused faith and credit by another Department of Government.")

**14.** This analogy has occasionally been employed by the courts in analyzing extradition challenges in other contexts. In *Ward v. Rutherford,* 921 F.2d 286 (D.C.Cir.1990), for example, the D.C. Circuit rebuffed the appellant's claim that magistrates could not constitutionally preside over extradition hearings. The court observed that "[a]n extradition hearing . . . is akin to a prelimi-

nary examination, a proceeding customarily handled by magistrates." *Id.* at 286. The court also quoted *Benson v. McMahon,* 127 U.S. 457, 463, 8 S.Ct. 1240, 1243, 32 L.Ed. 234 (1888), to the effect that an extradition proceeding is "of the character of those preliminary examinations which take place every day in this country . . . for the purpose of determining whether a case is made out which will justify the holding of the accused." Similarly, the court in *Hooker v. Klein,* 573 F.2d 1360, 1366–68 (9th Cir.1978), observed that "[a] finding of extradition signals the start, rather than the conclusion, of litigation of the fugitive's guilt or innocence. As opposed to a final judgment, it is truly an interlocutory order, more akin to a preliminary hearing on criminal charges."

Whatever the utility of this analogy might be in other contexts, as discussed *infra,* the court finds it inapposite to separation-of-powers analysis.

Imagine a statute or rule of criminal procedure which commanded a judge or magistrate, upon finding probable cause to execute a search, to certify his finding, "together with a copy of all the testimony taken before him," to the Attorney General for further review. Despite the fact that a probable cause determination is merely preliminary and not the final word of the Judicial branch, such a law would certainly raise grave separation-of-powers concerns. And yet, the extradition statute provides for exactly this type of Executive branch review. Not only that, the decision which the statute requires the extradition judge to certify to the Secretary of State is not "preliminary"—*it is the final word of the Judiciary on the question of extraditability.* Subjecting the final determinations of the Judiciary to Executive branch review in this manner is manifestly unconstitutional. *See Plaut,* —— U.S. at ——, 115 S.Ct. at 1453.

A more accurate analogy than the one offered by the government would be the following hypothetical statute:

> In any criminal proceeding against a foreign national, upon exhaustion of the defendant's post-conviction remedies, the Judicial branch shall certify to the Secretary of State the defendant's conviction, together with a record of all of the evidence received in the cause, that the Secretary may, in his discretion, vacate the conviction.

■ This hypothetical statute is the functional equivalent of the current extradition scheme. Following the Judiciary's final determination of a particular legal issue, both statutes provide for further Executive branch review. Under both statutes, the Secretary of State is given unfettered discretion to set aside the Judiciary's resolution of a particular case. Moreover, both statutes, by commanding the Judiciary to transmit a record of the *evidence* received, clearly purport to confer upon the Secretary the authority to review the *legal* determinations of the Judicial branch. The hypothetical statute set forth above is obviously unconstitutional; the extradition statute, though less obviously so, is nevertheless equally infirm.[15]

■ Finally, although the parties agree that federal extradition judges act in their official judicial capacities, it might nevertheless be suggested that the extradition statute is distinguishable from the hypothetical statute set forth above because the rulings of extradition judges are somehow "non-judicial." As the parties seem to recognize, such a description would be utterly fanciful. The role assigned to judges by the extradition statute is quintessentially judicial; evaluation of evidence and the application of law to facts are core judicial functions. Extradition judges are either acting as Judicial officers or they are not—the statute cannot be saved by hypothesizing some unique interstitial space within the Constitution wherein judges may render non-binding legal rulings which are then subject to review by the remaining branches of government. Nor may the unconstitutional effect of the statute be avoided simply by referring to the role of extradition judges as "quasi-judicial" or "*sui generis.*" Thus, while the court recognizes the gravity of its ruling today, it will not attempt to avoid an unpleasant result through the artful manipulation of terminology. *Cf. Mistretta v. United States,* 488 U.S. 361, 393, 109 S.Ct. 647, 665–66, 102 L.Ed.2d 714 (1989) (noting that "separation-of-powers analysis does not

---

15. To fully understand why the government's analogy breaks down, it is necessary to appreciate the difference between simple prosecutorial discretion, on the one hand, and affirmative reliance upon considerations which are constitutionally forbidden, on the other. The critical concept here, in other words, is the distinction between a statute which specifically confers upon the Executive branch an impermissible power, and a statute which is merely silent on the question of the scope of the Executive's discretion.

Executive branch officials typically need not articulate their reasons for not proceeding with a given law enforcement undertaking. Therefore, it is unavoidably the case that a particular law enforcement decision might be made on the basis that the judiciary "got it wrong," and the search, arrest, etc., could not lawfully be undertaken after all. So long as the Executive does not expressly state an *impermissible* basis for a given decision, there is nothing the courts can do. However, when a statute purports to confer upon a member of the Executive branch the unconstitutional authority to review and revise the legal rulings of the Judiciary, and when the evidence demonstrates that the Executive in fact exercises this unlawful power, then that statute must yield.

turn on the labeling of an activity"); *Metropolitan Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 267, 111 S.Ct. 2298, 2307, 115 L.Ed.2d 236 (1991) (quoting *Mistretta* for the same proposition).

### D. Accountability

Although the foregoing analysis sufficiently establishes the unconstitutionality of the extradition statute, one further observation seems warranted, given the rather extraordinary nature of today's ruling. It might be suggested that the court's decision to strike down 18 U.S.C. § 3184 represents an unnecessarily rigid and formalistic application of separation-of-powers principles. After all, the statute has been on the books in essentially the same form for over 150 years, and it does not appear to have caused significant difficulties thus far. There are two responses to this argument.

■ The short answer is that a statute which offends separation-of-powers by permitting the Executive to review the decisions of the Judiciary is unconstitutional, period. No matter how practical a statute appears to be, and no matter how long it has been on the books, once its infirmity becomes apparent, the courts have a duty to strike it down.

The second, and more pragmatic, response to the argument is that the present extradition statute effectively eliminates accountability for what is—particularly to the accused—a weighty and momentous decision. First, both the public and the accused have a right to know exactly who makes the final legal determination as to extraditability. The current structure of the statute prevents

this from happening. As the plaintiffs aptly note, "[t]he practical effect of this buck-passing and finger-pointing is that no one branch, much less a single judicial or executive officer, can be held to answer for the injustices of a particular case." Plaintiffs' Opp. at 3.

■ Second, when the Secretary of State makes a foreign policy decision, the public has a right to hold him accountable for the consequences of that decision. For example, if the Secretary declined to extradite a fugitive to one country in order to curry favor with another, and the first country reacted in a way that was harmful to the interests of the United States, the public would have a right to hold the Secretary of State accountable for that foreign policy decision. Under the present statute, however, the Secretary may simply claim that his "hands were tied" because the law did not permit him to perform the requested extradition.[16] Again, nothing requires the Secretary of State to explain his decision not to perform a given extradition. If he does offer an explanation, however, he may not cite as reasons for his decision considerations which are exclusively committed to another branch of government. The public is entitled to hold the Secretary of State accountable for his foreign policy decisions. Because it permits the Secretary to rely upon considerations which are not within his competence, the present extradition statute improperly shields the Executive from public accountability.

## III. Procedural Issues

### A. Comity

Earlier in the proceedings, the government argued that plaintiffs' claims were moot and

---

**16.** At one point during oral argument, counsel for the government actually seemed to suggest that the Secretary's ability to offer a non foreign-policy based reason for a decision not to extradite was a *virtue* of the present scheme. Counsel observed that "if a Secretary of State says, 'I've reviewed the record and I don't think the evidence is sufficient,' in fact, what may be going on is that the Secretary of State says, 'No way am I sending anybody back to *that* country [for trial]." Tr. at 46.

Apparently, this is a strategy which has been employed by the Secretary of State in the past. *See* Abbell & Ristau, *supra*, at 260 (arguing that the last two times the Secretary of State has declined to surrender legally extraditable persons, "there is reason to believe that the Secre-

tary's actions ... were motivated by political considerations and that his stated reasons for refusing surrender were only intended to make his refusal more politically palatable to the requesting countries.").

It may well be the case that diplomacy occasionally prevents the Secretary from explaining the true basis for his decision not to extradite a particular individual. This does not mean, however, that the Secretary may impugn the competence of the Judiciary as he does when he says to a requesting country (or to the American people), "If it had been within my power, I would certainly have surrendered that person; unfortunately, the extradition judge's conclusion was erroneous, and the accused was not, in fact, legally extraditable."

also that principles of comity dictated that this court should dismiss plaintiffs' suit in light of the *habeas* action which is currently pending in the Northern District of Illinois. In its briefing, the government recognized that this court could, in fact, grant plaintiffs the relief they sought, and that plaintiffs' claims were therefore not moot after all. The government's comity arguments are similarly unfounded and may be quickly dispensed with.

 The government contends that this court should dismiss the plaintiffs' complaint and require them to litigate their claims before the *habeas* court in Illinois. This would result in a needless waste of judicial resources. At the time the present action was filed, plaintiffs believed they were facing the imminent threat of being extradited to Canada. To protect themselves from this serious—and irremediable—injury, plaintiffs properly filed a declaratory judgment action in this court.[17] It is quite clear that the *habeas* court is incapable of granting the relief which the plaintiffs seek in this court, and to which they are plainly entitled. Although it appears to be rare in practice, other courts have noted the propriety of presenting a challenge to extradition proceedings by way of a declaratory judgment action rather than a *habeas* proceeding. *E.g., Sayne v. Shipley,* 418 F.2d 679, 688 n. 17 (5th Cir.1969).[18]

 Furthermore, given the nature of their challenge, a *habeas* proceeding would be a singularly *inappropriate* proceeding in which to address plaintiffs' claims. First, it is clear that a *habeas* court has no power to issue prospective relief. Thus, while it is true that the District Court in Illinois could reach the same conclusion that this court has[19] and discharge the plaintiffs from the (constructive) custody of the United States Marshal, the Illinois court could *not* protect the plaintiffs from a subsequent extradition proceeding brought by the government in another federal judicial district or before an Illinois state court. Counsel for the government has represented that the government would not proceed with further extradition proceedings under those circumstances;[20] however, plaintiffs are surely entitled to more than the good-faith assurances of the government on this point. In sum, dismissing the plaintiffs' claims at this late stage would result in an unnecessary duplication of judicial efforts and piecemeal adjudication of this important issue in countless future *habeas* proceedings; it would also deny plaintiffs the type of relief to which they are clearly entitled.

### B. Class Certification

 Plaintiffs have filed a motion for class certification, seeking to represent a class "of all persons who are or in the future will be under a threat of extradition from the United States pursuant to 18 U.S.C. § 3184." Plaintiffs' Mem. in Supp. M. Class. Cert. at 1. First, the government raises serious questions about 1) the court's ability to define an appropriate class; 2) the "typicality" of the plaintiffs' interest in challenging the extradition statute; and 3) the ability of the plain-

---

17. At the time they filed their application for a temporary restraining order and for preliminary injunction, plaintiffs were under the impression that *surrender warrants had not yet been signed* by the State Department and that it was still possible to prevent this from happening by requesting an Order from this court enjoining any official within the Department from signing the warrants. During the June 9, 1995, TRO hearing, counsel for the government, Manuel Rodriguez, informed the court that the warrants had not yet been signed. In reality, the warrants were signed by Deputy Secretary of State Strobe Talbott on May 2, 1995. The government later explained that Mr. Rodriguez had simply failed to notice the signed warrants during his necessarily hasty review of the file in preparation for the TRO hearing.

18. The wisdom of this rule is especially clear in this case. The court has already received one motion to intervene from a prisoner awaiting extradition in the Southern District of Florida. As set forth below, the relief granted today makes class certification, joinder, and intervention unnecessary. It is clear, however, that if the court were to dismiss this action now, the result would be an unnecessary proliferation of *habeas* challenges in various courts across the country, each alleging the very same theory presented here.

19. But only after expending its own resources performing the very same analysis just completed by this court.

20. *See* Tr. at 56.

tiffs to fairly and adequately represent the interests of the class. Second, and more importantly, it is clear that the relief granted by the court today will serve to protect not only the plaintiffs, but all others similarly situated. In cases involving primarily declaratory or injunctive relief, where the certification of a class would add little or nothing to the ability of the court to effect the relief sought, this Court has often followed the sensible practice of declining to certify the putative class. *E.g., Gray v. International Brotherhood of Electrical Workers,* 73 F.R.D. 638, 640–41 (D.D.C.1977). The court trusts that, from this time forward, the United States government will not surrender any person in a manner which is inconsistent with the terms of the court's declaratory judgment. Accordingly, plaintiffs' motion for class certification will be denied.

IV. Conclusion

■ The procedure set forth in 18 U.S.C. § 3184 has governed the extradition of accused persons from this country for over 150 years. It appears that no one has ever challenged the constitutionality of the extradition statute on separation-of-powers grounds before, nor does it appear that any court has ever raised the issue on its own initiative. As the government points out, the historical acceptance of the procedures set forth in the statute raise a strong presumption of constitutional validity. Nevertheless, while it is quite clear that the Constitution forbids the Executive branch from reviewing the legal decisions of the federal Judiciary, this is precisely the effect of the statute. It is certainly unfortunate that this fundamental flaw has gone unnoticed for so long; however, the court will not further compound this error by turning a blind eye to the statute now. The court's duty is clear. For the reasons set forth above, it is hereby

ORDERED that plaintiffs' motion for class certification is DENIED; and it is further

ORDERED that insofar as it purports to confer upon members of the Executive branch the power to review decisions of Article III federal judges and United States magistrates, Title 18, § 3184 of the United States Code is hereby declared to violate the United States Constitution; and it is further

ORDERED that the United States is hereby enjoined from taking any further act towards executing the surrender warrants signed by Deputy Secretary of State Strobe Talbott on May 2, 1995.

**SO ORDERED.**