**UNITED STATES of America,
Plaintiff,**

v.

**Rogelio MONTEMAYOR
SEGUY, Defendant.**

**No. CRIM. H–03–449.**

United States District Court,
S.D. Texas.

July 23, 2004.

---

Mike DeGeurin, Jr., Foreman Degeurin et al, Houston, TX, for Defendant.

Rogelio Montemayor Seguy, Houston, TX, pro se.

Financial Litigation, US Attorney's Office, DeGabrielle, US Attorneys Office, US Marshal, US Probation, Pretrial Services, Houston, TX, for United States of America.

## Opinion on Extradition

HUGHES, District Judge.

1. *Introduction.*

The Mexican government has asked the United States of America to extradite the former director of the nation's oil company so that it may try him for six charges of embezzlement and misappropriation of

funds. Because there is probable cause to believe that he committed the crimes, he will be returned to Mexico to answer them.

2. *Background.*

In 2000, President Ernesto Zedillo appointed Rogelio Montemayor Seguy director general of Petroleos Mexicanos, the national oil company of Mexico. It typically is called Pemex. Both Zedillo and Montemayor are products of the Partido Revolucionario Institucional—PRI—the dominant political party in Mexico for decades.

Under Mexican law, with the help of the energy and finance divisions, Pemex annually proposes a budget. It must be approved by the congress. The budget is divided into broad categories of funding called chapters. The chapters give an outline of general expenditures. They are divided into more specific disbursements called concepts or positions. Pemex is responsible for allocating the funds of the chapters among the positions within each chapter. Once a financial position is approved, the money can be spent.

As an example from the American experience, a "chapter" of an appropriations bill would furnish funds for a new class of vessel for the navy. The Department of Navy would develop plans that describe its size and armament, and it would have "financial positions" that specify the construction, equipping, testing, and shore support. These would be the specifics of execution under the policy grant from the legislature.

As director general, Montemayor was ultimately responsible for labor relations with the Sindicato de Trabajadores Petroleros de la Republica Mexicana—the union of Pemex. Pemex and the Union agree on a global collective bargaining contract every two years. The agreements create a basic outline of labor relations. They are supplemented with "management-union agreements" that address issues that arise in the life of the main agreement but are not significant enough to require renegotiating the basic collective-bargaining agreement.

Pemex and the Union signed an agreement that lasted from 1999 through 2001. After Montemayor became director general, the Union complained that Pemex was not abiding by the agreement, particularly the company's funding of social aid to the Union. To resolve these complaints, Pemex and the Union entered three management-union agreements.

The first agreement—9356—paid 350 million pesos to the Union for social aid, that included schools and libraries, new computers, payments to low-income workers, and other social programs.

The second agreement—9399—lent 640 million pesos to the Union to cover costs related to lawsuits against the Union. A portion of the loan, 103 million pesos, was paid from a Union bank account to one of its officials, Luis Ricardo Aldana Prieto. The rest of the loan was paid by the Union to the PRI by cash or check. The loan was to be secured by Union dues and repaid in 20 months.

The third agreement—9442—paid the Union 1.1 billion pesos to *reconcile* housing problems, job transfers, and legal costs related to Union litigation in the United States. The net amount of the payment was 460 million pesos because the cost of agreement 9399 was included in its gross amount.

3. *Charges.*

On May 3, 2002, a criminal court in Mexico City authorized an arrest warrant for Montemayor and five others. The warrant covers seven transactions, but the charges against Montemayor are based

only on payments under agreements 9356, 9399, and 9442. The Mexican prosecutors claim that with each agreement, Montemayor peculated and wrongfully used his governmental powers.

A public servant peculates if, having received something of value belonging to the state, he diverts it from the governmental purpose for his own or others' uses. Under Mexican law, peculation is "a public servant who having received money, equity, real estate, or any other thing which belongs to the state, to a decentralized state agency or to a private person, for its management, deposit for any other cause, diverts it from their purpose, for his own use or the use of others." Art. 223, ¶ I, of the Mexican Federal Criminal Code. We would probably describe it as embezzlement.

A public servant wrongfully uses his powers when, having been entrusted with public funds, he knowingly (a) channels them to a public application different from the one that was specified or (b) makes an illegal payment. Under Mexican law, wrongful use of powers occurs when a "public servant who, having been entrusted with public funds, knowingly channels them to another public application, different from that for which it was targeted or makes an illegal payment." Art. 217, ¶ III, of the Mexican Federal Criminal Code. We would probably describe it as misappropriation. As a short reference, it will be called diversion.

### 4. Claims.

Generally, Montemayor disputes the factual assertions of the charges and the government's legal analysis of his conduct. Montemayor says that the agreements comply with the collective agreements of 1997 and 1999, and are otherwise authorized. He also contends that he comported with Mexican law and with the custom between Pemex and the Union.

He contests his extradition on these legal theories:

- The statute governing extradition is unconstitutional.
- American laws are not analogous to peculation and diversion.
- Peculation and diversion cannot be based on the same conduct.
- The charges are too vague.

### 5. Process.

Originally in the United States, the judiciary did not participate in extradition; it was an executive matter. The executive began to include a judicial screening in its treaties in the early nineteenth century. In 1848, congress passed a general statute governing extradition that included the judicial scrutiny that we still use. See Act of Aug. 12, 1848, ch. 167, § 5, 9 Stat. 302, 303; codified now as 18 U.S.C. § 3184. A judge decides whether there is probable cause that the accused committed the crime. If the judge decides that probable cause supports the charges, the president through his secretary of state decides whether the accused should be extradited as a matter of his domestic and foreign responsibilities. See U.S. Const., art. II, § 2, cl. 2.

Rather than being a criminal trial, the extradition is part of the general American commitment to governmental regularity. The court checks the executive's basis for delivering a person to another nation's criminal courts. Based on the government's presentation of the charges and supporting facts, the court determines whether the statutory criteria have been met, after hearing from the accused by argument or testimony.

The critical judgment in an extradition hearing is whether the record reveals probable cause to believe that the defen-

dant committed the charged offenses. Montemayor was entitled to a hearing to determine whether there was probable to believe cause that he committed the charged crimes. He had an opportunity to explain the information sent from abroad and to argue the law. *See Koskotas v. Roche,* 931 F.2d 169, 175 (1st Cir.1991); *Escobedo v. United States,* 623 F.2d 1098, 1107 (5th Cir.1980).

### 6. *Separation.*

Montemayor argues that the extradition process is unconstitutional. He says that the secretary of state's authority to decide, after the judge's decision, whether actually to deport the defendant violates the separation of powers. *See Lobue v. Christopher,* 893 F.Supp. 65, 75 (D.D.C.1995), *rev'd on juris.,* 82 F.3d 1081 (D.C.Cir. 1996).

An extradition hearing is substantially similar to criminal proceedings where a judge has to make a determination of probable cause. If a judge finds probable cause for the issuance of a warrant to search a house, he merely allows the search. The officer—an agent of the executive branch—may decide not to search; he retains discretion whether to use the authority permitted by the court. As with search warrants, extradition certificates are necessary for the executive to act, but they do not compel action. *See DeSilva v. DiLeonardi,* 125 F.3d 1110 (7th Cir.1997). Parenthetically, under the Constitution, state executives do not have discretion to decline extradition to another state. *See* U.S. Const. Art. IV, § 2.

Instances of the executive's having discretion after a decision by the court are parallel to other proceedings. If a person is convicted, a president could pardon him without rendering the trial an executive function. Also, if a magistrate finds probable cause after a preliminary hearing, the executive could stop prosecuting before trial. *See* Fed.R.Crim.P. 5.1(e). In civil cases, after a judge awards the government money damages, the executive may settle for less or abandon the judgment altogether.

### 7. *Controversy.*

In a variation on the issue of separation of powers, Montemayor says that the court's authority under the statute is only to render an advisory opinion. An opinion from a court that counseled the executive would be an impermissible mingling of the branches' authority because the Constitution requires that courts decide only actual disputes—"cases or controversies." *See* U.S. Const. art. III, § 2.

In an extradition, events have happened, charges have been filed, and another country has asked the United States to yield the defendant to it. The United States has asked this court for permission to extradite. This proceeding was not based on hypothetical facts. In an extradition, the court does not *advise* the executive whether it ought to send the defendant abroad; it decides whether he *may* send him away. This is a judicial function in a genuine dispute.

Advisory opinions bind no one; even the most cogent may be ignored, but the result of an extradition proceeding may preclude the executive from delivering the accused to the applicant nation. With advisory opinions, the judge's views are requested; with extradition, the judge's help is required. The statutory process for extradition comports with the Constitution and, under it, with the executive's authority to conduct foreign affairs and with this court's distinct, limited role. *See In re Extradition of Sutton,* 905 F.Supp. 631, 635 (E.D.Mo.1995).

### 8. *Dual Criminality.*

 Montemayor argues that the complaint violates the treaty between the United States and Mexico because the nature of the charges are not criminal in both countries. *See* Extradition Treaty between United States and Mexico, May 4, 1978, U.S.-Mex., 31 U.S.T. 5059. The elements of the crimes do not have to be exactly the same, but the conduct must be criminal in both countries. *See Kelly v. Griffin,* 241 U.S. 6, 14, 36 S.Ct. 487, 60 L.Ed. 861 (1916).

Montemayor contends that the United States does not have crimes that are analogous to Mexico's peculation and diversion. That is incorrect. In America, it is illegal to steal from the United States as a public official or plain citizen. The American statute strings quasi-synonyms to make its point—"to embezzle, steal, purloin, or convert funds of the United States." *See* 18 U.S.C. § 641. This country has an array of statutes that make it criminal to take from the government.

Second, Montemayor is accused of diverting government funds for his or someone else's benefit, using money for purposes other than those intended, including illegal payments to an Union official. *See* Art. 223, ¶ I, Art. 217, ¶ III, of the Mexican Federal Criminal Code. The United States Code says, "[an] officer of the United States ... [who] for any purpose not prescribed by law ... or applies any portion of the public money intrusted to him, is guilty of embezzlement ...." 18 U.S.C.S. § 653. If not precisely the same, the American law is substantially similar to the Mexican statutes in Montemayor's charges. *See Theron v. United States Marshal,* 832 F.2d 492, 496 (9th Cir.1987).

Montemayor also complains that his acts—as described in the charges—do not imply the criminal intent requisite under the laws of both our countries. A decision whether the facts compel a finding that he acted with an intention to violate the law is for the trial. Just as the intention *inferable* from the facts described in an indictment may be susceptible to reasonable disagreement, the alternative interpretations of the data in the foreign charges do not have to be resolved now. Both act and intention only need to be reasonably potential. The government has met its responsibility.

### 9. *Incompatibility.*

Montemayor argues that Mexico cannot claim that he is guilty of embezzlement and diversion on the same facts. He claims that peculation does not require an existing obligation; it is merely stealing money. With a diversion, a public official makes an illegal payment by shifting the use of authorized funds. Montemayor says that this kind of "payment" requires the existence of an earlier obligation. Montemayor contends that he cannot both steal and misapply a single disbursement of government funds.

 Based on the oral and written testimony, it is probable that Montemayor committed both crimes. The court of Mexico may decide that the charges are fatally inconsistent, and it would then require that the prosecution elect to abandon. Further, charging incompatible offenses is not intrinsically irregular. Also, the government often seeks lesser-included offenses in an indictment. *See United States v. McGeehan,* 824 F.2d 677 (8th Cir.1987).

### 10. *Probable Cause.*

 As a legal standard, probable cause means that the facts and circumstances are rationally sufficient to support a person of reasonable caution in the belief that an offense has been committed. The

question is: After a quick, disinterested look at the prosecution's trustworthy information and the charges, are the reasonable inferences more than mere suspicion or bare conclusion? *See Locke v. United States,* 11 U.S. 339, 7 Cranch 339, 348, 3 L.Ed. 364 (1813) [ship seizure]; *Brinegar v. United States,* 338 U.S. 160, 175–6, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The testimony establishes probable cause to believe that Montemayor committed peculation and diversion.

Although the business of Pemex is large and complex, the Mexican government's claims are plausible and straightforward. With each transaction, it identifies acts by Montemayor and explains why they are illegal under its interpretation of Mexican law. While the court in Mexico will decide whether the prosecutor's facts are reliable and analysis is correct, the government has satisfied the threshold for extradition.

Montemayor explained some of his acts at the hearing. While they are defensive and not preclusive, he argues ratification by Pemex of his acts. The "ratification" of the agreements by Pemex's general counsel are inadequate generalities. Several of the officials that helped process the paperwork for the agreements and ratifications have also been indicted. Moreover, Montemayor confuses *discussing* the agreements at a board meeting with *approval* by the board. The government has shown that some of the money went straight to Union officials; that was not discussed in the minutes. More important, Montemayor did not show that the money went to the "social aid" projects, like schools, computers, clinics, or sports facilities, uses of the disbursement that are easily checked. Giving millions of pesos to the Union in the months leading up to the presidential election is another circumstance allowing an inference of the true purpose.

Agreement 9399—the 640 million peso loan—was 128 times greater than the second largest loan Pemex had given the Union during the 1999 collective agreement. Further, it was five times larger that all of the loans combined that Pemex had given the Union during that time.

Also, there is a material question whether Union dues could secure the loan as the law required. Montemayor explained that the government did not take into consideration the Union's ability to collect "extraordinary" dues from its members. Extraordinary dues are simply a temporary increase in dues. If that was a realistic source of income for the Union, it is curious why the Union needed Pemex's money at all if it could have raised money by assessing its members at any time, precluding the loan.

Agreement 9442 is more evidence of the potential illegality of the second agreement. Montemayor said that he did not know that the Union would use some of the 1.1 billion pesos given by the third agreement to repay the loan it received a couple months before. Despite saying that he thought the Union was required to repay the loan with its own money, he promptly accepted money from the third agreement to satisfy the loan. In fact, Pemex only required that the Union pay 340 million pesos to satisfy the 640 million pesos loan, cancelling the balance.

Montemayor has explanations, and his interpretation of the evidence may be a defense at trial. His position is a mixture of background information about Pemex's operations and views about Mexican law as it applies to his situation. He does not argue physically impossibility—that he was incapacitated when the agreements were made. He only complains that his conduct was not actually criminal. Moreover, his argument that his acts followed

historic practices between Pemex and the Union may be no defense in Mexico.

In essence, this case relates to—and is created by—the relaxed nature of the Pemex budgetary process. The process leaves room for the director of the company to implement funding guidelines, satisfy obligations under collective agreements, and solve problems as they arise.

The Mexican government questions Montemayor's behavior with respect to three transactions. The process of the budgetary directives allows both parties to offer competing and plausible explanations. Although it may be an opportunity, a loose budgetary process is not a license to steal or divert funds. The charges are supported by competent evidence that tends to show that he might have done it criminally. A court in Mexico may decide whether Montemayor violated the law, simply used poor judgment in his official capacity, or neither. *See Garcia–Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir.1971).

*11. Discovery.*

 Montemayor has complained that he was given insufficient opportunity to discover the records of Pemex and the prosecutor. The court, however, has allowed extensive production of documents over the last six months. This discovery was especially generous when one considers the preliminary nature of this proceeding. Also, much of the requested material relates only to whether the prosecutor in Mexico is factually and legally correct in his positions before the court *there.* None has to do with the propriety of extradition under the American Constitution, American statutes, or the Mexican–American treaty. If this were an extradition between two American states, the record would have been much more constrained than it has been here. Discovery beyond the extensive applications by the governments was allowed by this court out of caution, not doubt.

*12. Conclusion.*

There is an enforceable extradition treaty between Mexico and the United States. Montemayor has been charged by the Mexican government with peculation and diversion, and those charges are extraditable offenses. *See* Extradition Treaty between United States and Mexico, May 4, 1978, U.S.-Mex., 31 U.S.T. 5059. Montemayor is the accused and testified in the extradition hearing about his conduct. Based on the oral and written evidence, there is probable cause to believe that Montemayor peculated and diverted funds through management-union agreements 9356, 9399, and 9422. This court's findings do not denigrate Montemayor's assertion of innocence; they only allow him to be sent to face those six charges in Mexico.

**Certificate of Extraditability for Rogelio Montemayor Seguy**

Under the Treaty of Extradition between the United States of America and the United Mexican States of May 4, 1978, the United States of America may extradite Rogelio Montemayor Seguy to the Republic of Mexico for prosecution for:

(1) *peculado* (embezzlement); and

(2) *uso indebido de atribuciones y facultades* (wrongful use of powers)

as punishable under Article 223, paragraph I, and Article 217, paragraph III, of the Federal Criminal Code, and based on:

(1) Administrative Agreement 9356 of May 8, 2000;

(2) Administrative Agreement 9399 of June 5, 2000; and

(3) Administrative Agreement 9442 of September 11, 2000

that support the arrest warrant issued on May 3, 2002, by the Thirteenth District

Federal Penal Trials Judge in the Federal District for Rogelio Montemayor Seguy.

Rogelio Montemayor Seguy has through August 11, 2004, to file a writ of habeas corpus.